The ESTATE OF Selma SMITH, William P. Ingrim, Individually and as Personal Representative of the Estate of Selma Smith, Wallace A. Smith, Wesley C. Monson, Thelma Ingrim Walston, and Elizabeth Jenkins, Appellants,

v.

Charles SPINELLI, Clark Rush, Lorane Owsichek–Cupples, David Schmid, Victoria Blower, David White, Matthew Fink, Patricia Lefevre, and Corbett Mothe, Appellees.

No. S–13128.

Supreme Court of Alaska.

Sept. 18, 2009.

---

Calvin R. Jones, Jones & Colver, LLC, Anchorage, for Appellants.

Richard W. Maki, David H. Shoup, Tindall Bennett & Shoup, P.C., Anchorage, for Appellees Spinelli, Rush, Owsichek–Cupples, Schmid, Blower, White, and Mothe.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

## OPINION

FABE, Chief Justice.

## I. INTRODUCTION

This dispute centers around a 3.38–acre parcel of coastal land in the Turnagain area of Anchorage. Prior to the 1964 Alaska Earthquake, this parcel consisted of a steep, eroding bluff and tidal mudflats. The powerful earthquake collapsed the bluff, spreading it out over the mudflats and transforming the once unusable parcel into gently sloping, potentially developable coastal property. Uncertainty regarding this parcel's ownership arose forty years later when the Municipality

of Anchorage sought to construct sewage facilities on it.

The appellants are heirs of the children of Rasmus Simonson, whose 147–acre 1920s homestead encompassed the disputed parcel, and heirs of his daughter Selma Smith, who subdivided and sold the homestead in the 1940s and 50s (collectively, "the Simonson heirs"). The Simonson heirs contend that Smith's subdivision plat shows that she did not sell the bluff and mudflats when she subdivided the Simonson homestead and that they thus retain title to the developable land now located where the bluff and mudflats once stood. The appellees are the current owners of eight lots in the Simonson subdivision that directly abut the disputed parcel (collectively, "the lot owners"). The lot owners argue that Smith did not intend to retain the bluff and mudflats when she subdivided the Simonson homestead and that the superior court correctly awarded them the disputed parcel. They also contend that the superior court's decision can be affirmed based on the "strip and gore" doctrine, which creates a presumption against a grantor's retention of small, useless strips of land, and on Alaska's Earthslide Relief Act, which provides procedures for determining property boundaries following an earthslide.

Because the subdivision plat is ambiguous and because the superior court did not clearly err in concluding that the evidence surrounding Smith's sale of the Simonson homestead shows that she did not intend to retain the disputed parcel, we affirm the superior court's decision to award the disputed parcel to the lot owners. We do not reach the questions whether the strip and gore doctrine and the Earthslide Relief Act are applicable to this case.

## II. FACTS AND PROCEEDINGS

### A. Facts

In 1927 homesteader Rasmus Simonson obtained 147 acres of coastal land from the federal government in what is now the Turnagain area of Anchorage. The northern (seaward) boundary of the Simonson homestead was the pre-earthquake mean high tide line of Knik Arm, as established by a 1916 General Land Office (GLO) survey. Following the deaths of Simonson and his wife, the Simonson homestead passed to six of their children, including Selma Smith. In 1946 Smith's siblings deeded the entire property in trust to Smith, empowering her to plat, subdivide, and sell it, with the proceeds to be split equally among the children.

Smith proceeded to plat and subdivide the Simonson homestead, recording several different plats, the last of which was Plat P–48B, recorded in 1949. Smith sold the eight northernmost (seawardmost) lots in the subdivision, depicted as Lots 1–8 in Block C of Plat P–48B, between 1949 and 1952. These eight lots, which have since changed hands many times, are now owned by the appellees and are currently vacant. The appellees and their predecessors in interest purchased these lots with the understanding that they were buying oceanfront property. The appellees' deeds describe their lots with reference to Plat P–48B.

Plat P–48B depicts the northern boundary of the appellees' eight lots with a solid line drawn at what before the 1964 earthquake was the upper edge of a steep, eroding 50–70 foot bluff with tidal mudflats below. That is, in Plat P–48B, the northern boundary of the Simonson subdivision was drawn not at the northern boundary of the Simonson homestead (the 1916 GLO survey mean high tide line), but rather closer inland, along the upper edge of the bluff. Plat P–48B thus left unplatted and undemarcated the largely unusable parcel of bluff and mudflats that was located between the subdivision boundary and the mean high tide line. Evidence at trial showed that a plat containing such a deficiency could not be recorded under modern standards.

Fifteen years after Plat P–48B was prepared, the violent 1964 Alaska Earthquake triggered soil liquefaction that caused the bluff to collapse and spread out onto the mudflats, destroying the houses that had been located on appellees' eight lots, pushing the mean high tide line seaward, and changing the previously unusable, unplatted parcel

into gently sloping, potentially developable[1] land.

The ownership of the unplatted parcel went unexamined for some forty years following the earthquake. Neither the Simonson heirs nor the owners of the eight abutting lots paid property taxes on the parcel or attempted to build on it or sell it. No Simonson heir took any action to suggest that they owned the parcel, and several later testified that they never had reason to believe they had any interest in the parcel until the present controversy arose. Smith died in 1984. There was no evidence that she ever conveyed the parcel back to her siblings for whom she had held the Simonson homestead in trust, and the parcel was not included in her estate. The parcel remained undeveloped except insofar as the Municipality of Anchorage's Tony Knowles Coastal Trail was built across a portion of it in the 1980s.

Many decades after the earthquake, while preparing for the possible construction of sewage facilities in the area, the Municipality of Anchorage discovered that the parcel's ownership was uncertain. In 2005 a title company identified the parcel's owner as "Selma Smith, Trustee." Smith having died, the Municipality sent a tax bill for the parcel to Smith's son William Ingrim, who paid it. The Municipality returned the tax money, however, when it learned that Ingrim's ownership of the parcel was contested by the lot owners.

### B. Proceedings

In early 2006 the owners of five of the eight lots abutting the disputed parcel filed suit against a number of parties potentially claiming an interest in the parcel, including Smith's son Ingrim. The lot owners sought to quiet title to the disputed parcel in their names, arguing that it should be considered part of their lots, which they purchased with the understanding that they were buying oceanfront property. They also alleged claims under the Earthslide Relief Act[2] and the adverse possession statute.[3]

The Municipality of Anchorage, the Estate of Selma Smith, Ingrim (individually and as personal representative of Smith's estate), and some individual Simonson heirs appeared to defend their claims to the disputed parcel, though there was initially some controversy about who was participating in the lawsuit given the large number of Simonson descendants. The Simonson heirs brought the owners of the remaining three of the eight lots abutting the disputed parcel into the litigation.

The interests of the Municipality were resolved by settlement in November 2007. The Municipality obtained an easement across the disputed parcel for the Tony Knowles Coastal Trail[4] as well as title to all land located north (seaward) of the 1916 GLO mean high tide line that had formed the northern boundary of the original Simonson homestead.[5]

The lot owners and the Simonson heirs filed cross-motions for summary judgment. The lot owners' motion was procedurally based, focusing on the fact that Smith's estate had been closed for many years. The Simonson heirs' motion was grounded in a strict interpretation of Plat P–48B, in which, as described above, the northern boundary of the lot owners' property was drawn inland of the disputed parcel. The Simonson heirs argued based on the plat that Smith clearly did not sell the disputed parcel when she subdivided the Simonson homestead and thus that they retained title to it. Superior Court Judge Michael Spaan denied the parties'

---

1. The parcel was not truly developable until 1978 when building restrictions on land created by the 1964 earthquake were lifted.

2. AS 09.45.800–.880.

3. AS 09.45.052.

4. Prior to settlement, the Municipality argued that it had obtained an easement across the parcel by prescription because the Coastal Trail had been in place and openly used by the public for more than the statutory period.

5. Because the earthquake pushed the mean high tide line seaward, it created some usable land located beyond the 1916 mean high tide line that had formed the northern boundary of the Simonson homestead; because that land had never been part of the homestead, it was found to belong to the Municipality.

cross-motions for summary judgment and held a bench trial in January 2008.

Following the trial the superior court concluded that "the owners of Lots 1–8 are the rightful owners of the strip of land north of their lots with ownership extending to the mean high water line." The superior court found that Plat P–48B was ambiguous as to whether Smith intended to convey the disputed parcel along with Lots 1–8 and that the surrounding circumstances established that Smith did in fact intend to convey the disputed parcel rather than retain it. The superior court alternatively reached the same result "by way of the presumption contained in the strip and gore doctrine," which "allows a court to award a narrow strip of land, with little value of its own, that was mistakenly reserved from a conveyed tract of land to the party that purchased the larger associated tract." The superior court rejected the lot owners' adverse possession claim based on a lack of evidence of "continuous, open and notorious use" of the disputed parcel, and it declined to reach the lot owners' Earthslide Relief Act claim.

The Simonson heirs appeal.

## III. STANDARDS OF REVIEW

■ The Simonson heirs contend that the superior court erred in denying their motion for summary judgment. But the superior court denied the motion due to the existence of genuine issues of material fact, and an order denying summary judgment on factual grounds is not reviewable on appeal following a trial on the merits.[6] Accordingly, we address the Simonson heirs' arguments in the context of determining whether the superior court erred in rendering its final judgment in favor of the lot owners, rather than whether it erred in denying the heirs' motion for summary judgment.

■ The Simonson heirs challenge the superior court's conclusion that Plat P–48B, which is incorporated into the lot owners' deeds, is ambiguous. "Whether a deed is ambiguous is a question of law,"[7] and "[w]e review legal questions de novo, 'adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy.' "[8] The Simonson heirs also question the superior court's factual determination that Smith intended to convey the disputed parcel along with Lots 1–8 when she subdivided the Simonson homestead. "Conclusions about the parties' intent drawn by the trial court after sifting and weighing . . . evidence [extrinsic to a deed] are conclusions of fact" that we review for clear error.[9] We "will reverse the trial court's factual findings only when, 'after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made.' "[10] "We review the record with the knowledge that it is the province of the trial court to judge witnesses' credibility and weigh conflicting evidence."[11]

## IV. DISCUSSION

The lot owners' deeds and the deeds of their predecessors in interest incorporate Plat P–48B by reference.[12] The issue before us is thus the proper interpretation of Plat P–48B with respect to the disputed parcel, which, as discussed above, consisted of a steep bluff and mudflats at the time the plat was prepared in 1949. The Simonson heirs argue that Plat P–48B clearly demarcates Lots 1–8 such that they do not include the disputed parcel, meaning that the disputed parcel was retained by Smith after she subdivided and sold the rest of the Simonson homestead. The lot owners counter that the

6. *Larson v. Benediktsson,* 152 P.3d 1159, 1169–70 (Alaska 2007).

7. *Norken Corp. v. McGahan,* 823 P.2d 622, 626 (Alaska 1991).

8. *Pastos v. State,* 194 P.3d 387, 391 (Alaska 2008) (footnote omitted and alteration in original) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

9. *Norken,* 823 P.2d at 626.

10. *Peterson v. Ek,* 93 P.3d 458, 463 (Alaska 2004) (quoting *Demoski v. New,* 737 P.2d 780, 784 (Alaska 1987)).

11. *Id.*

12. *See* 26A C.J.S. *Deeds* § 226 (2001) ("A map, plat, plan, or survey, by virtue of apt reference thereto in a deed, may be treated as part of, and may be construed with, the deed in determining the property conveyed.").

plat is ambiguous and that the evidence surrounding the subdivision of the Simonson homestead shows that Smith did not actually intend to retain the disputed parcel, meaning that it was conveyed as part of Lots 1–8.

The superior court determined that Plat P–48B is "ambiguous" and "vague as to whether Smith conveyed all of the land owned by her in trust to the original purchasers of Lots 1–8." The superior court then examined extrinsic evidence of Smith's intent when she sold Lots 1–8, finally concluding that she did not intend to retain the disputed parcel.

The Simonson heirs now argue primarily that the superior court erred in finding that Plat P–48B is ambiguous, and that because the plat is unambiguous, the superior court should not have inquired further into Smith's intent. The Simonson heirs also contend that insofar as the superior court did inquire into Smith's intent, its conclusion that she did not intend to retain the disputed parcel was erroneous.

## A. Our Three–Step Approach to Deed Interpretation

■ "[T]he touchstone of deed interpretation is the intent of the parties,"[13] and "where possible, ... the intentions of the parties [will be] given effect."[14] We have instructed that "a three-step analysis should be employed in interpreting a deed."[15]

■ "The proper first step in deed construction is to look to the four corners of the document to see if it unambiguously presents the parties' intent...."[16] If a deed when "taken as a whole" is open to only one reasonable interpretation, the interpreting court

"need go no further."[17] "Whether a deed is ambiguous is a question of law."[18]

■ Once a court determines that a deed is ambiguous, "the next step in determining the parties' intent is a consideration of the facts and circumstances surrounding the conveyance."[19] We have noted that "this inquiry can be broad, looking at 'all of the facts and circumstances of the transaction in which the deed was executed, in connection with the conduct of the parties after its execution.' "[20] "Conclusions about the parties' intent drawn by the trial court after sifting and weighing such extrinsic evidence are conclusions of fact," which we review for clear error.[21]

■ Finally, only if the parties' intent cannot be discerned after an examination of the deed itself and the extrinsic evidence surrounding its creation should a court resort to rules of construction.[22] "The purpose of rules of construction ... 'is not to ascertain the intent of the parties to the transaction. Rather, it is to resolve a dispute when it is otherwise impossible to ascertain the parties' intent.' "[23]

## B. Step One: Ambiguity. The Superior Court Did Not Err in Determining that Plat P–48B Is Ambiguous.

■ "The proper first step in deed construction is to look to the four corners of the document to see if it unambiguously presents the parties' intent...."[24] Both sides suggest that we consider various pieces of evidence outside the "four corners" of Plat P–48B in making this initial ambiguity determination. The lot owners assert by analogy to contract interpretation that "[e]xtrinsic evidence may

---

13. *Norken*, 823 P.2d at 625.

14. *Shilts v. Young*, 567 P.2d 769, 773 (Alaska 1977).

15. *Ashley v. Baker*, 867 P.2d 792, 794 (Alaska 1994).

16. *Norken*, 823 P.2d at 626.

17. *Id.*

18. *Id.*

19. *Id.*

20. *Id.* at 629 (quoting *Rizo v. MacBeth*, 398 P.2d 209, 211–12 (Alaska 1965)).

21. *Id.* at 626.

22. *Id.*

23. *Id.* at 625 (quoting 6A R. Powell & P. Rohan, Powell on Real Property ¶ 899[3], at 81A–108 (1991)).

24. *Id.* at 626.

be considered" in assessing whether a deed is ambiguous. But our approach to deed interpretation is not identical to our approach to contract interpretation.

In the context of contract interpretation, we have departed from the "cumbersome" traditional parol evidence rule by allowing the use of extrinsic evidence without the need for a preliminary finding that a contract is facially ambiguous.[25] Thus, extrinsic evidence may be consulted in determining whether a contract is ambiguous as well as in resolving any ambiguity.[26] But, as we have recognized, our three-step approach to deed interpretation differs from our more flexible approach to contract interpretation and does not allow the use of extrinsic evidence in making the threshold determination whether a deed is ambiguous.[27] We therefore decline to consider extrinsic evidence in reviewing the superior court's conclusion that Plat P–48B, which is part of the lot owners' deeds, is ambiguous. A deed is unambiguous if, looking within "the four corners of the document," "the words of the deed taken as a whole are capable of but one reasonable interpretation."[28]

The superior court found that "[l]ooking within the four corners of the document" Plat P–48B is ambiguous "because there is no express demarcation or reservation of any land north of Lots 1–8 and the location of the Mean High Water Line is not expressly represented." The superior court noted that Plat P–48B leaves indeterminate the distance between the mean high water line and the boundary of Lots 1–8 by demarcating it with a "squiggled line," thus making it unclear whether the mean high water line intersects with any portion of the boundary. For these reasons, the superior court concluded that Plat P–48B is "vague as to whether Smith conveyed all of the land owned by her in trust to the original purchasers of Lots 1–8."

The Simonson heirs contend that any ambiguity in Plat P–48B relating to the area and boundaries of the disputed parcel "does not affect the non-ambiguous area of each of Lots 1 through 8 that were conveyed which

25. *See Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 771 n. 1 (Alaska 1982) (rejecting the "unduly cumbersome" approach whereby "resort to extrinsic evidence can take place only after a preliminary finding of ambiguity" in a contract, and approving of an approach that initially "turns to extrinsic evidence for such light as it may shed on the reasonable expectations of the parties"); *see also* RESTATEMENT (SECOND) OF . CONTRACTS § 212 cmt. b (1981) (stating that because "meaning can almost never be plain except in a context," "[a]ny determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties"); Ferdinand S. Tinio, Annotation, *The Parol Evidence Rule and Admissibility of Extrinsic Evidence to Establish and Clarify Ambiguity in Written Contract,* 40 A.L.R.3d 1384, at § 4 (1971) (listing Alaska among the states that "have tended to move away from the traditional and mechanical 'complete-on-its-face' approach, and to accept evidence of the parties' negotiations and of other relevant and external circumstances in order to ascertain whether a written contract is ambiguous" (footnote omitted) ).

26. *Wessells v. State, Dep't of Highways,* 562 P.2d 1042, 1046 (Alaska 1977) ("An ambiguity exists [in a contract] only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms.").

27. *Ashley v. Baker,* 867 P.2d 792, 794 n. 1 (Alaska 1994) (noting that the "seemingly rigid three-step formulation [for deed interpretation] may be out of step with our approach to contract interpretation," which "do[es] not require a threshold finding of ambiguity before considering extrinsic evidence").

28. *Norken,* 823 P.2d at 626 (holding that a deed was ambiguous where it warranted quiet enjoyment but also reserved gravel rights because "quiet possession of the premises and removal of the gravel are mutually exclusive"); *see also Ashley,* 867 P.2d at 793–94 (holding that deed granting a "1/2 interest in lot 13 . . . specifically the 1 acre lot with apt C located on it" was open to three possible interpretations and therefore ambiguous); *Ault v. State,* 688 P.2d 951, 955 (Alaska 1984) (noting that the phrase "in addition to existing highway" created ambiguity in a deed); *Dimond v. Kelly,* 629 P.2d 533, 540 (Alaska 1981) (noting that a deed conveying title to various buildings was ambiguous regarding what land was conveyed along with the buildings); *Shilts v. Young,* 567 P.2d 769, 773–74 (Alaska 1977) (noting that a deed was ambiguous where it described property with reference to a survey map that could not be located).

[have] boundaries [that] are clearly defined." They point out that the lot owners and their predecessors in interest have always been aware of the square footages of their lots, which are shown on Plat P–48B and do not include the disputed parcel. But we have said that a deed should be examined "as a whole" in determining ambiguity,[29] and the entirety of Plat P–48B is incorporated into the lot owners' deeds. Accordingly, Lots 1–8 cannot be viewed in isolation. As the superior court concluded, Plat P–48B's failure to demarcate and reserve the disputed parcel or specify the exact location of the mean high tide line creates ambiguity regarding Lots 1–8 despite their seemingly well-defined boundaries.

The Simonson heirs also argue that "it is clear that Lots 1 through 8 were not shown on Plat 48–B as having riparian rights."[30] They point out that "there is nothing to prevent a separation of such interest resulting in one person owning the riparian rights and privileges associated thereto, and another person owning the uplands." They argue that Plat P–48B unambiguously severs the riparian rights from Lots 1–8. But Plat P–48B does not unambiguously sever the riparian rights from Lots 1–8, as it does not reserve or demarcate the land lying between the lots and the tidelands and leaves unclear and unspecified the relationship between the northern boundary of the lots and the mean high tide line. Moreover, the lot owners counter that "the property line was platted as close as reasonably possible to the water's edge," giving rise to a presumption that title passed to the abutting tidelands in the absence of an express reservation to the contrary.[31] And the fact that the lots were platted so close to the water's edge, without any developable land separating them from the tidelands, supports the superior court's determination that Plat P–48B is ambiguous as to whether the lots were intended to have riparian rights.

Finally, the Simonson heirs assert that "platting standards were loose in early times" and "it was not normal to name remnants outside a plat," meaning that the superior court's finding of ambiguity "wrongfully imposes current platting and surveying standards" on Plat P–48B. But this argument focuses on extrinsic evidence that may not be considered in the course of making the preliminary determination whether Plat P–48B is ambiguous, so we decline to consider it.

Accordingly, we conclude that the superior court did not err in determining that Plat P–48B is ambiguous.

**C. Step Two: Intent. The Superior Court Did Not Err in Determining that Smith Intended to Convey the Disputed Parcel Along with Lots 1–8.**

 Once a court determines that a deed is ambiguous, "the next step in determining the parties' intent is a consideration of the facts and circumstances surrounding the conveyance."[32] After finding Plat P–48B ambiguous, the superior court examined "the facts and circumstances surrounding the sale of Lots 1–8 by Selma Smith" and found that "it was the intent of Smith, as trustee for herself and her siblings, to convey the disputed strip of property as part of Lots 1–8." The Simonson heirs primarily contend, as discussed above, that Plat P–48B is unambig-

---

**29.** *Norken*, 823 P.2d at 626; *see also* 9 THOMPSON ON REAL PROPERTY § 82.13(b)(2), at 668 (David A. Thomas ed., 2d ed. 1999) ("The intent of parties must be ascertained from the whole instrument and not from isolated portions thereof.").

**30.** The parties use the word "riparian" to discuss rights to the tidelands in this case, though that term is usually used to refer to rights to streams or rivers. *See* BLACK'S LAW DICTIONARY 1352 (8th ed.2004) (defining "riparian" as "[o]f, relating to, or located on the bank of a river or stream (or occasionally another body of water, such as a lake)").

**31.** *See, e.g., Olde Severna Park Improvement Ass'n, Inc. v. Gunby*, 402 Md. 317, 936 A.2d 365, 373 (2007) ("When waterfront property is conveyed, there exists a presumption that the property is accompanied by the riparian rights to those waters."); *McAdam v. Smith*, 221 Or. 48, 350 P.2d 689, 692–93 (1960) (recognizing "that a conveyance of the upland passes title to land in the bed of the river or way" and applying this presumption to "conveyances involving abutting tideland" as well); *see also* 78 AM.JUR.2D *Waters* § 44 (2002) (discussing the presumption arising from a conveyance of the upland).

**32.** *Norken*, 823 P.2d at 626.

uous and thus that the superior court should not have inquired into Smith's intent, but they also argue that the superior court erred in concluding that Smith did not intend to retain the disputed parcel. "Conclusions about the parties' intent drawn by the trial court after sifting and weighing ... extrinsic evidence are conclusions of fact[, which] [t]his court will not disturb ... unless they are clearly erroneous...." [33]

In determining that Smith did not intend to retain the disputed parcel, the superior court made a number of findings: (1) the disputed parcel would have been surveyed and platted if Smith had intended to reserve it, especially if, as the Simonson heirs argued below, she feared liability and intended to reserve the parcel to create a buffer zone to protect Lots 1–8 from erosion of the bluff; (2) Smith never reconveyed the disputed parcel to her siblings as she would have been obligated to do had she retained it, given that she held the Simonson homestead in trust; (3) no Simonson heir ever attempted to sell the disputed parcel even after its value was increased by the earthquake; (4) the disputed parcel was not included in Smith's probate estate when she died in 1984; (5) no Simonson heir ever attempted to develop the disputed parcel after 1978 when development became permissible; (6) no Simonson heir ever thought they owned any land around the disputed parcel until the instant dispute arose; and (7) platting standards at the time Plat P–48B was recorded were "less rigorous" than they are today, and the lot owners' experts' testimony that the northern boundary of Lots 1–8 was probably drawn along the top of the bluff "as a matter of convenience" was more credible than the contrary testimony of the Simonson heirs' expert. The Simonson heirs contend that these findings are not sufficient to support the superior court's ultimate conclusion that Smith did not intend to retain the disputed parcel.

The Simonson heirs contend that the fact that Smith never reconveyed the disputed parcel to her siblings is irrelevant to Smith's intent because "no one kn[e]w of the existence of the parcel." They further point out that the parcel was not included in Smith's probate estate because her son Ingrim did not know about the parcel. But the fact that none of the Simonson heirs was ever told about the parcel seems to support the superior court's conclusion that Smith did not intend to retain the parcel, rather than undermining it.

The Simonson heirs also argue that the fact that Smith and her siblings never attempted to sell or develop the disputed parcel is not indicative of her intent because in 1978, when the disputed parcel became legally developable after the earthquake, Smith was seventy-five years old and most of her siblings were dead. The heirs also note that the lot owners never attempted to develop the disputed parcel either. But while these points weigh in the heirs' favor, they are not sufficient to engender a "firm and definite conviction" [34] that the superior court made a mistake in ultimately concluding, based on all of the facts, that Smith did not intend to retain the disputed parcel.

Finally, the Simonson heirs assert that Smith reserved a right-of-way to the disputed parcel, evidencing an intent to retain it. However, as the lot owners persuasively counter, this assertion "is founded on a misreading of the plat and ignores pertinent testimony." It is clear that there is no right-of-way reserved within the Simonson homestead extending to the disputed parcel—the right-of-way the Simonson heirs refer to is a part of a neighboring subdivision and is beyond the Simonson property line. Moreover, the testimony the Simonson heirs reference does not appear to support their position— the testimony of the lot owners' expert recognizes that the right-of-way is not part of the Simonson subdivision and the testimony of the Simonson heirs' expert is not focused on the right-of-way issue and seems founded in a misreading of the plat.

The superior court's determination that Smith did not intend to retain the disputed parcel was not clearly erroneous. Accordingly, we affirm the superior court's interpretation of Plat P–48B and its consequent deci-

33. *Id.*

34. *Id.* (internal quotation marks omitted).

sion to award the disputed parcel to the lot owners.[35]

The superior court found "[a]lternatively" that "through the operation of the legal presumption embodied by the strip and gore doctrine, the [disputed] strip of land was intended by the grantor, Selma Smith, to pass to the [lot owners'] predecessors in interest." The strip and gore doctrine, which as the superior court noted is "primarily associated with Texas,"[36] provides that

> unless the grantor explicitly reserves with plain and specific language in the deed a fee in a narrow strip of land adjoining the conveyed land, it is presumed that a grantor has no intention of reserving a fee in a narrow, adjoining strip of land when the strip ceases to be of use by virtue of the conveyance.[37]

According to the Texas Supreme Court, the strip and gore doctrine developed because "separate ownership of long narrow strips of land, distinct from the land adjoining on each side, is a fruitful source of litigation and disputes."[38] Additionally, "[w]hen a small parcel of land adjoins a main tract and has no particular value apart from the main tract, parties ordinarily would expect it to pass with the grant."[39]

The strip and gore doctrine is best understood as a rule of construction that is meant to apply where the parties' intent cannot be discerned by other means.[40] We apply rules of construction as the last step in the deed interpretation process, but "[o]nly if [the first] two steps do not resolve the controversy...."[41] In this case, the first two steps have resolved the controversy—we have determined that Selma Smith intended to convey the disputed parcel along with Lots 1–8—so we need not reach the question whether the strip and gore doctrine is applicable here.[42] We also need not reach the question whether the Earthslide Relief Act[43] is applicable to this case.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's decision in favor of the lot owners.

35. The Simonson heirs argue that in order to prevail the lot owners must demonstrate by "clear and convincing evidence" that their deeds should be reformed so as to encompass the disputed parcel. *See Groff v. Kohler,* 922 P.2d 870, 874 (Alaska 1996) ("[A] party will be able to obtain reformation of an instrument only if that party can clearly and convincingly show that both parties had an identical intention as to the terms to be embodied in the proposed written conveyance and the writing executed by them is materially at variance with that intention." (internal quotation marks, emphasis, and alterations omitted)). Because we find that Plat P–48B is ambiguous, we do not think it is necessary that the clear and convincing standard required for reformation be met.

36. *See* Robert G. Natelson, Modern Law of Deeds to Real Property § 8.23, at 217 (1992) ("Some courts ...—notably but not exclusively those of Texas—apply a presumption known as the 'strip and gore' doctrine ...." (footnote omitted)).

37. *Moore v. Energy States, Inc.,* 71 S.W.3d 796, 799 (Tex.App.2002). The phrase "strip and gore doctrine" also appears to be used at times to refer to narrower, related presumptions regarding strips of land along highways or railroad

rights of way. *See, e.g., Blendu v. United States,* 79 Fed.Cl. 500, 507 n. 7 (Fed.Cl.2007); 9 Thompson on Real Property, *supra* note 29, § 82.13(e), at 682–83.

38. *Cantley v. Gulf Prod. Co.,* 135 Tex. 339, 143 S.W.2d 912, 915 (1940).

39. Natelson, *supra* note 36, § 8.23 at 218.

40. *See Miller v. Crum,* 314 S.W.2d 389, 395 (Tex. Civ.App.1958) ("The strip and gore doctrine is a rule of construction of a deed based on public policy to discourage separate ownership of narrow strips of land and applies only to ambiguous deeds, whether the ambiguity is found in the deed itself or arises from an attempt to apply the description on the ground.").

41. *Norken,* 823 P.2d at 626.

42. We note in passing that the superior court's decision to grant the disputed parcel to the lot owners seems consistent with the strip and gore doctrine.

43. AS 09.45.800–.880.