*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN REEVES and FAIRBANKS GOLD CO., LLC, | ) ) ) | Supreme Court Nos. S-15461/15482 |
| Appellants and Cross-Appellees, | ) ) ) | Superior Court No. 4FA-12-02133 CI |
| | ) | O P I N I O N |
| v. | ) ) | No. **7219**– January 26, 2018 |
| GODSPEED PROPERTIES, LLC and GOLD DREDGE 8, LLC, | ) ) ) | |
| Appellees and Cross-Appellants. | ) ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: Joseph W. Sheehan, Sheehan Law Office, Fairbanks, for Appellants/Cross-Appellees. Michael C. Kramer, Kramer and Associates, and Robert John, Law Office of Robert John, Fairbanks, for Appellees/Cross-Appellants.

Before: Fabe, Chief Justice, Stowers, Maassen, Bolger, and Carney, Justices. [Winfree, Justice, not participating.]

STOWERS, Justice.

FABE, Chief Justice, with whom CARNEY, Justice, joins, dissenting in part.

# I. INTRODUCTION

Two adjoining landowners dispute the creation and continuing validity of an easement for ingress and egress to and from property near Fairbanks. The superior court held that a valid easement was created but had been extinguished by prescription. We are asked to decide whether one party's mining activities — placing gravel piles, equipment, and a processing plant in the easement — were sufficient to prescriptively extinguish the entire easement. We hold that they were not. Although the processing plant extinguished the portion of the easement on which it stood, the evidence presented regarding the gravel piles and equipment was insufficient to support extinguishing the entire easement.

# II. FACTS AND PROCEEDINGS

## A. Facts

Alaska Gold Company owned a considerable amount of property near Fairbanks in the early 1980s. In 1982 John Reeves purchased a lot from Alaska Gold — MS-851 — that contained an old gold dredge, which he turned into a tourist attraction. The parties refer to this property as "Gold Dredge 8." MS-851 was located southwest of MS-1724, a separate lot owned by Alaska Gold. Alaska Gold allowed Reeves to cross MS-1724 to reach Gold Dredge 8.[1]

---

[1] A sketch of the relevant properties is attached as an Appendix to this opinion. Reeves also owned the Byrne Fraction, which connected the easement to Gold Dredge 8.

In 1986 Alaska Gold sold MS-1724 to Alice Ellingson. Alice married Harold Ellingson shortly thereafter. The deed contained a reserved easement for Alaska Gold to cross MS-1724 to reach its other properties:

> SPECIFICALLY RESERVING UNTO THE GRANTOR, its successors and assigns a dedicatable easement for ingress, egress, and utilities, 100 feet in width, along the southerly boundary of Side Claim On Bench Off No. 2 Above Discovery On Engineer On R.L. Placer, United States Mineral Survey No. 1724 beginning at its intersection with the westerly boundary of the Old Steese Highway right of way and proceeding South 59°37' West approximately 500.00 feet to Corner No. 1 of said claim; Thence North 70°09' West approximately 728.2 feet to Corner No. 2 of said claim.

Alaska Gold owned MS-1709, the property at the terminus of the reserved easement. Pete Eagan, Alaska Gold's manager beginning in 1986, used the easement occasionally to travel to Alaska Gold's land beyond the easement. Eagan was friendly with the Ellingsons, and he was aware of the easement to cross MS-1724. He also gave Reeves permission to use Alaska Gold's easement to access Gold Dredge 8.

Alice and Harold Ellingson erected a gold plant on MS-1724 soon after Alice purchased the property from Alaska Gold.[2] The plant began operating in 1988. At Reeves's suggestion, the Ellingsons also erected an elevated footbridge spanning the easement so that tourists could walk from Gold Dredge 8 to the gold plant to view the mining operations. Eagan commonly drove off the easement onto other portions of the Ellingsons' property with the Ellingsons' knowledge.

---

[2] The deed conveyed the property to Alice Ebenal, but she changed her name to Alice Ellingson after marrying Harold. Alice and Harold built the gold mine together. Harold died before trial.

In 1996 Reeves sold Gold Dredge 8 to Holland America, which in turn sold it to Godspeed Properties. In 2000 Reeves bought Alaska Gold's remaining property in the area. This included part of MS-1709 — the parcel next to MS-1724 — at the terminus of the easement. In 2002 the Ellingsons shut down the gold plant, and in 2009 Godspeed purchased MS-1724 from Alice Ellingson. Thus, at the time of this litigation, Godspeed owned Gold Dredge 8 and MS-1724, while Reeves owned MS-1709, the parcel at the end of the easement crossing MS-1724.

Reeves informed Godspeed of the easement and offered to sell it to Godspeed. The parties negotiated between 2009 and 2012 but were unable to come to an agreement. During this time Godspeed developed MS-1724 as an integrated tourist attraction with Gold Dredge 8; it built a small-gauge railway through the property for visitors to view Gold Dredge 8 and learn about mining in the area.

In 2012 Reeves was granted plat approval to subdivide MS-1709. The plat memorialized Reeves's plan to dedicate the easement through MS-1724 to public use as the access for the subdivision. Reeves constructed a rough dirt road through the easement. In response, Godspeed built a gravel berm across the easement and blocked access.

B.    Proceedings

Godspeed filed a complaint against Reeves seeking declaratory relief and to quiet title. Godspeed also moved for and was granted a preliminary injunction barring Reeves from constructing the road until a court determined whether the easement was valid. After considerable motion practice, the superior court ruled that the 1986 deed from Alaska Gold to Ellingson created a valid easement. The court also concluded that "John Reeves and [Reeves's company] Fairbanks Gold Company, LLC are the successors-in-interest to Alaska Gold Company." The parties proceeded to trial on the

main remaining issue: whether the easement was extinguished by prescription during the time that the Ellingsons owned MS-1724 and Alaska Gold owned MS-1709.

During the trial, Alice Ellingson testified that she and Harold poured the concrete foundation for the gold plant in 1986 and that it was "all concrete and steel and it . . . probably [weighed] . . . a couple hundred tons." The plant was "pretty sophisticated," cost close to a million dollars to install, and occupied "not quite half" of the easement.[3] She explained that equipment, conveyor belts, and sand, gravel, and sewer rock surrounded the plant. She also testified that the plant was in continuous operation until 2002 when it was dismantled. Both Alice and Eagan testified that the footbridge between Reeves's property and the gold plant was high enough to drive underneath.

There was also considerable testimony about the condition of the remainder of the easement. Alice testified that Harold built berms out of sewer rock around the property. One year, he also blocked the main gate with a berm in the winter and unblocked it in the spring. And she testified that there were piles of material in the easement that were continually being built up and moved as they were sold. Hatton Franciol, a former employee of the Ellingsons, testified that cars had been parked on the easement and that, based on a picture taken when the Ellingsons owned MS-1724, a pile of rock spanned almost the entire easement at one end. But he also explained that miners berm off the entrance to mines at the end of the season to comply with safety regulations. Like Alice, he testified that the material piles in the easement were for sale and

---

[3]    It is clear from aerial photographs of the area that Alice meant the gold plant occupied almost half of the width of the easement where it was situated, not half of the entire easement.

constantly moving. Eagan testified that the process piles[4] "were not permanent"; "the nature of [the] business is that you produce piles of material and then hopefully you're [going] to sell them."

Eagan further testified that he would visit the property three to six times each summer. He stated that "Harold ended up having the plant out there and . . . parts of the easement were blocked. But [Eagan did] know that you could pretty much get through there," and it was never "absolutely blocked." Alice testified that a "substantial" gate blocked the easement but that it was only meant to keep out the public and that Reeves had a key to the gate. Reeves testified that the gate was built after he sold the dredge. And former employees testified that they had seen Reeves using the easement frequently.

In its decision the superior court noted that "because of the social relationship between the Ellingsons and Eagan/Alaska Gold, adversity is difficult to determine." As a result the court required "Godspeed [to] show extensive activity in the easement area." The court concluded that "operating and maintaining the gold plant within the easement area for a period of 15 years unreasonably interfered with Alaska Gold's ingress and egress along the easement to access MS-1709," and "[i]t also unreasonably interfered with a prospective dedication of the easement to the public." The court found that the gold plant was a "permanent and expensive improvement that was difficult and damaging to remove" and that it "completely blocked approximately half of the easement." The court further found that sometimes the plant activities blocked the entire easement or forced someone navigating it to go close to the gold plant in a manner that would be unsafe for the general public. Finally, the court found that the Ellingsons had constructed various barriers that restricted public access to the easement.

---

[4] These piles were created by material that was produced by the gold plant.

Based on these findings the court concluded that the entire easement had been terminated by prescription.

Both parties appeal. Godspeed appeals the superior court's conclusion that an easement was created, and Reeves appeals its conclusion that the easement was terminated by prescription.

## III. STANDARD OF REVIEW

Whether a deed or plat is ambiguous is a question of law that we review de novo.[5] "When applying the de novo standard of review, we apply our independent judgment . . . , adopting the rule of law most persuasive in light of precedent, reason, and policy."[6] When a deed is ambiguous, the trial court's findings about the parties' intent are findings of fact that we review for clear error.[7] A decision is clearly erroneous "when a review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[8]

---

[5]  *HP Ltd. P'ship v. Kenai River Airpark, LLC*, 270 P.3d 719, 726 (Alaska 2012).

[6]  *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 507-08 (Alaska 2015) (alteration in original) (quoting *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum., Inc.*, 322 P.3d 114, 122 (Alaska 2014)).

[7]  *Norken Corp. v. McGahan*, 823 P.2d 622, 626 (Alaska 1991).

[8]  *Chung v. Rora Park*, 339 P.3d 351, 353 (Alaska 2014) (quoting *Offshore Sys.-Kenai v. State, Dep't of Transp. & Pub. Facilities*, 282 P.3d 348, 354 (Alaska 2012)).

Whether an easement was extinguished by prescription presents issues of both law and fact.[9]  "We do not disturb a trial court's findings of fact unless they are clearly erroneous.  We review the application of law to facts de novo."[10]

## IV.  DISCUSSION

### A.    The 1986 Deed Created An Easement Appurtenant.

The superior court concluded that Alaska Gold's transfer of MS-1724 to Ellingson in 1986 created an easement appurtenant.[11]  Godspeed contends that this holding was error because the deed contained ambiguities.  Specifically, Godspeed argues that the deed uses the word "dedicatable" — which is not a word — and does not specify which property is benefited by the easement.

" '[T]he touchstone of deed interpretation is the intent of the parties,' and 'where possible, . . . the intentions of the parties [will be] given effect.' "[12]  We apply a three-step test to interpret a deed:  first, we "look at the four corners of the document to see if it unambiguously presents the parties' intent"; second, "[i]f a deed is ambiguous, the next step is to consider 'the facts and circumstances surrounding the conveyance' to discern the parties' intent"; and finally, "[i]n the event that the parties' intent cannot be

_____

[9]    *See HP Ltd. P'ship*, 270 P.3d at 726 (holding that creation of easement by prescription presented mixed issues of law and fact).

[10]    *Id.*

[11]    An easement appurtenant "is a right to use a certain parcel, the servient estate, for the benefit of another parcel, the dominant estate." *SOP, Inc. v. State, Dep't of Nat. Res., Div. of Parks & Outdoor Recreation*, 310 P.3d 962, 969 n.32 (Alaska 2013) (quoting 25 AM. JUR. 2D *Easements and Licenses* § 8 (2004)).

[12]    *Estate of Smith v. Spinelli*, 216 P.3d 524, 529 (Alaska 2009) (alterations in original) (first quoting *Norken Corp.*, 823 P.2d at 625; then quoting *Shilts v. Young*, 567 P.2d 769, 773 (Alaska 1977)).

determined, we rely on rules of construction."[13] The inquiry under step two "can be broad, looking at 'all of the facts and circumstances of the transaction in which the deed was executed, in connection with the conduct of the parties after its execution.' "[14]

The language of the 1986 deed states, in relevant part: "SPECIFICALLY RESERVING UNTO THE GRANTOR, its successors and assigns a *dedicatable* easement for ingress, egress, and utilities, 100 feet in width, along the southerly boundary of . . . [MS] No. 1724." While "dedicatable" is not a word, its use was plainly an attempt to create an easement that was capable of being dedicated.[15] We conclude that the use of a slight variation on a well-known and commonly used word does not make the deed ambiguous; rather, the use of the variant word is akin to a spelling mistake. "Where it is perfectly plain that a word is misspelled, the courts will construe the deed according to the meaning of the word intended, rather than according to the meaning of the word actually used."[16] This is especially true when construing the word as written "would give no effect to the clause containing the doubtful word."[17] Here "looking

---

[13] *McCarrey v. Kaylor*, 301 P.3d 559, 563 (Alaska 2013) (quoting *Estate of Smith*, 216 P.3d at 529).

[14] *Estate of Smith*, 216 P.3d at 529 (quoting *Norken Corp.*, 823 P.2d at 629).

[15] Black's Law Dictionary defines "dedication" as "[t]he donation of land or creation of an easement for public use." Dedication, BLACK'S LAW DICTIONARY (10th ed. 2014).

[16] *Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 136 S.W.2d 800, 803 (Tex. 1940) (quoting *Baustic v. Phillips*, 121 S.W. 629, 630 (Ky. 1909)).

[17] *Baustic*, 121 S.W. at 630.

within 'the four corners of the document,' 'the [word "dedicatable" is] capable of but one reasonable interpretation.' "[18] The deed is not ambiguous in this regard.

But the deed is ambiguous as to whether the easement is an easement appurtenant or an easement in gross. An easement appurtenant "is a right to use a certain parcel, the servient estate, for the benefit of another parcel, the dominant estate."[19] "[A]n appurtenant easement . . . may not be used for the benefit of property other than the dominant estate."[20] While easements appurtenant run with the land and continue to benefit the dominant estate, easements in gross are assigned to a specific person and do not run with the land.[21] Here, although the easement is for ingress and egress and is descendable,[22] it is ambiguous whether the easement is an easement appurtenant because it is not clear, looking at the face of the deed, which parcel of land is to benefit. Because the deed fails to explicitly state what parcel will be benefited by the easement, the deed must be considered ambiguous.[23]

---

[18]     *Estate of Smith*, 216 P.3d at 530 (quoting *Norken Corp.*, 823 P.2d at 626).

[19]     *SOP, Inc. v. State, Dep't of Nat. Res., Div. of Parks & Outdoor Recreation*, 310 P.3d 962, 969 n.32 (Alaska 2013) (quoting 25 AM. JUR. 2D *Easements and Licenses* § 8 (2004)).

[20]     *HP Ltd. P'ship v. Kenai River Airpark, LLC*, 270 P.3d 719, 730 (Alaska 2012) (second alteration in original) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.11 (AM. LAW INST. 2000)).

[21]     *See SOP, Inc.*, 310 P.3d at 968-69 (citing 25 AM. JUR. 2D *Easements and Licenses* §§ 8, 120 (2004)).

[22]     The deed uses the operative language "[reserving unto the grantor], its successors and assigns."

[23]     "Whether a deed is ambiguous is a question of law." *Estate of Smith*, 216 P.3d at 528 (quoting *Norken Corp.*, 823 P.2d at 626).

Thus, we proceed to apply the second step of our three-step analysis in interpreting deeds: we consider " 'the facts and circumstances surrounding the conveyance' to discern the parties' intent."[24] The relevant inquiry is whether the easement was intended to benefit another parcel of land or a person.[25]

The superior court considered evidence of the parties' intent, the situation of the properties, and the purpose and nature of the easement. The court found that "[the easement] clearly created a servient estate (MS-1724) in favor of a dominant estate (adjacent Alaska Gold [p]roperty, specifically, MS-1709, which is now divided into MS-1709 and MS-1709A)." It noted that the "domina[nt] estate is the property at the terminus of the easement corridor," MS-1709. This finding is not clearly erroneous. MS-1709 lies at the end of the easement, so it would be the logical benefited parcel of an easement for ingress and egress. The evidence shows that Alaska Gold usually accessed its land by driving across MS-1724. And a 2002 Notice of Reservation of Rights given by Alaska Gold to Reeves reflects this intent by stating that Alaska Gold had easements to access its adjoining land. The superior court therefore did not err in holding that the 1986 deed created a valid easement appurtenant on MS-1724.

## B. It Was Error To Conclude That The Entire Easement Was Terminated By Prescription.

The superior court concluded that the entire easement was terminated by prescription. An easement is terminated by prescription if the party claiming prescription can "prove continuous and open and notorious use of the easement area for a ten-year

---

[24] *McCarrey v. Kaylor*, 301 P.3d 559, 563 (Alaska 2013) (quoting *Estate of Smith*, 216 P.3d at 529).

[25] *See, e.g.*, *SOP, Inc.*, 310 P.3d at 968-69.

period by clear and convincing evidence."[26] The prescriptive period is triggered when "use of the easement 'unreasonably interfere[s]' with the current or prospective use of the easement by the easement holder."[27]

The superior court found that the gold plant was a "permanent and expensive improvement that was difficult and damaging to remove" and that "operating and maintaining the gold plant within the easement area for a period of 15 years unreasonably interfered" with Alaska Gold's use of the easement. The court also found that the operation of the plant used the entire easement, that Eagan did not drive next to the gold plant, and that it would not have been safe for him to do so.

Reeves disagrees with the superior court and argues: (1) there was no interference, much less unreasonable interference, with the current or prospective use of the easement because mining operations ceased before the development of the easement; (2) the Ellingsons' property was a mining claim, and therefore mining on the property should not be considered unreasonable interference; (3) gold plants are movable and therefore are not permanent improvements; and (4) the gold plant did not entirely block use of the easement.

We disagree with Reeves's third argument and conclude that the superior court did not err in holding that the gold plant extinguished that portion of the easement upon which it stood. But we agree with Reeves's fourth argument that the gold plant did not entirely block use of the easement. This suggests that the easement was partially

---

[26] *Hansen v. Davis*, 220 P.3d 911, 916 (Alaska 2009).

[27] *Id.* (alteration in original) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.9 (AM. LAW INST. 2000)).

prescribed. We requested supplemental briefing from the parties on partial prescription.[28]

### 1. Alaska law allows for partial extinguishment of an easement prescription.

In *Hansen v. Davis* we "follow[ed] the approach adopted by the Restatement (Third) of Property and many jurisdictions and h[e]ld that an easement can be extinguished by prescription."[29] We have not previously addressed the possibility of partial prescription, but we agree with the weight of authority that an easement may be partially prescripted.

The Restatement explains that an easement may be "*modified or extinguished*" by prescription;[30] it further clarifies in a comment that "extinguishment brought about by prescription may be complete or partial."[31] The treatise The Law of Easements and Licenses in Land explains, "An easement . . . may be increased in width,

---

[28] Reeves also argues that Godspeed's prescription claim is barred by the statute of limitations and estoppel and that if the easement was terminated he revived it after the gold plant was removed. The superior court did not address these issues because Reeves did not litigate them at trial. We therefore review for plain error and find none. *See Partridge v. Partridge*, 239 P.3d 680, 685 (Alaska 2010). A claim for prescription is based on, not subject to, the statute of limitations. *McGill v. Wahl*, 839 P.2d 393, 395-97 (Alaska 1992). And estoppel fails because Reeves does not point to any intention by Godspeed or Alice to deceive him. *See Dressel v. Weeks*, 779 P.2d 324, 329 (Alaska 1989) (requiring express intention to deceive when real property is involved). Reeves's claim that he re-established the easement was not litigated below, was inadequately briefed on appeal, and is based on facts that the superior court did not examine because they occurred after the prescriptive period.

[29] *Hansen*, 220 P.3d at 916 (citations omitted).

[30] RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 7.7 (AM. LAW INST. 2000) (emphasis added), *cited with approval in Hansen*, 220 P.3d at 916.

[31] *Id.* § 7.7 cmt. b.

depth, or height by prescription. Likewise, a servient owner may reduce an easement's dimensions by preventing the holder from utilizing a portion of the easement area for the prescriptive period,"[32] and more directly, "[A]n easement may be partially extinguished . . . ."[33] The treatise Powell on Real Property agrees: "The servient owner can extinguish an easement *in whole or in part* by adverse uses continued for the prescriptive period."[34]

The rationale underlying the doctrine of prescription supports recognizing partial prescription. "The doctrine [of prescription] protects the expectations of purchasers and creditors who act on the basis of the apparent ownerships suggested by the actual uses of the land."[35] Prescription also "is supported by the rationale that underlies statutes of limitation[:] [b]arring claims after passage of time encourages assertion of claims when evidence is more likely to be available and brings closure to legal disputes."[36] Recognizing partial prescription best allows for legal title to match apparent title and brings closure to legal disputes in the way that best reflects reality.[37]

---

[32]    JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS AND LICENSES IN LAND § 7:18 (2017).

[33]    *Id.* § 10:25, *cited with approval in Hansen*, 220 P.3d at 916-17.

[34]    4 POWELL ON REAL PROPERTY § 34.21[1] (Richard R. Powell & Michael Allen Wolf eds. 2017) (emphasis added).

[35]    RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.17 cmt. c (referenced in § 7.7 cmt. a as explaining rationale behind prescription of easements).

[36]    *Id.*

[37]    Godspeed argues that the language of *Hansen* precludes partial prescription. *Hansen* said, "[T]he prescriptive period is triggered where the use of the easement 'unreasonably interfere[s]' with the current *or prospective* use of the easement by the easement holder." *Hansen*, 220 P.3d at 916 (second alteration in original) (emphasis added) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.9). Godspeed
(continued...)

Godspeed argues that adopting partial prescription "will substantially erode the hostility element for prescription because doing so will encourage people to stealthily encroach on easements by expanding their garden, extending their lawn, or building an addition to their deck." Easement holders will still be able to use their easements, Godspeed argues, and will not recognize the infringement of their rights until it is too late. But this argument understates the "hardi[ness]"[38] of easements. The prescriptive period is not triggered until the owner of the servient estate's "use of the easement 'unreasonably interfere[s]' with the current or prospective use of the easement by the easement holder."[39] This standard sufficiently guards the rights of the easement holder.[40]

---

[37](...continued) notes that Reeves offers no examples of jurisdictions that use "prospective use" language and recognize partial prescription. But Godspeed points to no case where a court considered adopting partial prescription and decided not to do so. And our holding in *Hansen* that an easement can be extinguished by prescription did not reject the rationales that underlie prescription; it embraced them.

[38] 7 THOMPSON ON REAL PROPERTY § 60.08 (David A. Thompson ed., 2d ed. 2017) (calling easements "hardier creatures than . . . real covenants and equitable servitudes" because they are harder to terminate).

[39] *Hansen*, 220 P.3d at 916 (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.9); *see also* RESTATEMENT (FIRST) OF PROPERTY § 506 cmt. c (AM. LAW INST. 1944) ("For a use of the servient tenement to be adverse to the owner of an easement, the use must be made without submission to or without being in subordination to the owner of the easement and must be open and notorious." (cross-references omitted)).

[40] We note that the arguments Godspeed makes against the adoption of partial prescription here undermine its principal argument that we should conclude prescription took place in this case. Godspeed's hypothetical about encroachment on an easement that goes unnoticed by the easement holder is similar to the facts of this case: Godspeed's predecessors in interest erected a gold plant that blocked part of the easement, but Reeves's predecessor did not bring a case because it still was able to

(continued...)

The parties agree that if we adopt partial extinguishment, then the standard set forth in *Hansen* should apply. This is consistent with the authorities already cited, which treat partial extinguishment as part of the doctrine of extinguishment by prescription and not as a separate concept. We therefore hold that Alaska law recognizes partial extinguishment of easements through prescription and that the standard to show partial extinguishment is the standard we set out in *Hansen*.

### 2. The gold plant partially extinguished the easement.

The gold plant did extinguish that part of the easement upon which it stood. The superior court found that the gold plant "cost approximately one million dollars to erect" and "took years to build and substantial effort to dismantle." Alice testified that the plant was "all concrete and steel and it was probably . . . a couple hundred tons," and that it was in continuous operation from 1988 until 2002, when it was dismantled. The testimony established that the plant was in continuous, open, and notorious operation for more than ten years,[41] and the superior court therefore did not clearly err in finding that the gold plant was a permanent improvement.

### 3. The gold plant's operations did not fully extinguish the easement.

We do not agree with the superior court that the remainder of the easement was extinguished. "Whether the improvement is an unreasonable interference with the

---

[40](...continued)
access its land. Further, "expanding a garden" and "extending a lawn" are not enough to trigger extinguishment of an easement by prescription, *see Hansen*, 220 P.3d at 917, and "building an addition to [a] deck" may not be in all circumstances, *see Titcomb v. Anthony*, 492 A.2d 1373, 1375-76 (N.H. 1985) (holding that an easement was not totally extinguished because passage on foot was still possible).

[41]     *See Hansen*, 220 P.3d at 916 ("[A] party claiming that an easement was extinguished by prescription must prove continuous and open and notorious use of the easement area for a ten-year period by clear and convincing evidence.").

servitude depends on the character of the improvement and the likelihood that it will make future development of the easement difficult. If the improvement is temporary and easily removed, it is generally not unreasonable."[42]

Although the gold plant itself was an unreasonable interference, none of the parties testified to an impediment that continuously blocked the entire easement for the entire ten-year period. Alice testified that equipment, conveyor belts, and sand, gravel, and sewer rock surrounded the plant. A former employee testified that cars were parked in the easement and that a pile of rock spanned almost the entire easement during one year. This type of temporary activity was insufficient to terminate the easement over a mining claim.

In *Hansen* we considered whether the maintenance of a garden on an easement was sufficient to terminate an easement and concluded it was not.[43] We explained that "[a]s a matter of law, the maintenance of a garden on the easement area did not constitute an improvement sufficiently adverse to commence the prescriptive period."[44] And cars, equipment, and gravel piles are not significantly less moveable than a garden. In mining country gravel piles, berms, miscellaneous mining equipment, and vehicles (often broken down) are the "vegetation" one would expect to find "growing" in the area.

The weight of authority indicates that equipment, conveyor belts, and sand, gravel, and sewer rock are insufficient to terminate an easement, at least in a setting like

---

[42] RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.9 cmt. c; *see also Hansen*, 220 P.3d at 917 ("As a general guideline, temporary improvements to an unused easement area that are easily and cheaply removed will not trigger the prescriptive period.").

[43] *Hansen*, 220 P.3d at 917-18.

[44] *Id.* at 917.

mining country. "[T]he adversity standard is not met when the owner of a servient estate uses the easement area for gardening; places obstructions on the easement that the easement holder can simply go around; or relies on a natural barrier, such as an embankment, to obstruct the easement holder," and "parking cars from time to time in a manner that obstructs the easement does not meet the continuity requirement."[45] Further, "what constitutes unreasonable interference, and thus triggers the prescriptive period, [is] heavily fact dependent."[46] This includes the manner in which the parties are using the land.[47]

The superior court found that the operation of the gold plant, including the conveyor belts, jigs, and supporting equipment, made driving past it in the easement unsafe. The court also found that Eagan never drove past the plant in the easement, instead taking other routes through the property. Neither of these findings leads to prescription as a matter of law: "[w]here the easement holder has not used the easement for some time, or at all, the servient estate owner enjoys wide latitude with respect to use of the easement area, and a showing of extensive activity will be required to demonstrate adversity."[48] There is no reason why the Ellingsons should have had to worry about the

---

[45]     BRUCE & ELY, *supra* note 32, § 10:25 (citations omitted).

[46]     *Hansen*, 220 P.3d at 917.

[47]     *See id.*; BRUCE & ELY, *supra* note 32, § 10:25.

[48]     *Hansen*, 220 P.3d at 917. The superior court's finding that Eagan never drove past the gold plant in the easement was clearly erroneous. Eagan testified that he drove under the footbridge between the plant and Gold Dredge 8, which means that he drove in the easement next to the gold plant. This testimony is uncontradicted. Regardless, an easement holder does not have to use an easement to maintain title to it. *See id.*

safety of someone driving through the easement if no one was driving through the easement.

"[T]he servient estate owner[] . . . has a right to use the area in question to the extent that such use does not unreasonably interfere with the easement holder's rights."[49] This allows for maximum value to come from the easement. The question then is not whether Eagan actively asserted Alaska Gold's easement rights or whether Eagan could have driven on the easement at a time when he was not asserting those rights; the question is whether Eagan could have used the easement if he had insisted on using it. And more to the point, the question really is whether Eagan could not have used the easement for the entire ten-year prescriptive period. No evidence established that Eagan's use of the easement was unreasonably interfered with for the ten-year period.

As explained above, we conclude that the easement was terminated by prescription only where the gold plant sat. This means that the easement still exists in some form for its entire length but that part of it is narrower in width because of the gold plant's obstruction. The superior court found that the gold plant blocked at least half of the width of the easement. But the only evidence offered to show the location of the gold plant was several aerial photographs, and none of the photographs show the gold plant crossing the line that demarcates the boundary of the proposed public road — that is, none of the photographs show the gold plant extending even 40 feet into the 100-foot easement. Given that the photographs were the only evidence offered as to the position of the gold plant, the court's finding that at least half of the easement was blocked was clearly erroneous. On remand the superior court should determine the extent to which the permanent structure of the gold plant occupied the easement and terminate only that portion of the easement.

---

**49**      BRUCE & ELY, *supra* note 32, § 10:25.

Deciding this appeal calls for an understanding of Alaska history — particularly Alaska gold mining history and how gold mines operate. Operating an active gold mine means that gravel piles, berms, and miscellaneous mining equipment and vehicles will appear and move around the property and disappear over time. This is part and parcel to owning land in mining country, and the Ellingsons, Eagan, and Reeves all understood this. To conclude years later that these kinds of mining activities terminated the easement would ignore the reality of the parties' mining and other activities on the ground and would be unjust. We conclude that the easement was only terminated to the extent the gold plant stood on it and that none of the ancillary mining activities, rock piles, equipment, and vehicles were sufficient to terminate the remainder of the easement.[50]

---

[50] We offer several responses to the dissenting opinion. First, the dissent argues that "the court adopts a doctrine that is new to Alaska law without giving the parties an opportunity to litigate this issue in the trial court." But as explained in section IV.B.1 of our opinion, authoritative treatises "treat partial prescription as part of the doctrine of prescription and not as a separate concept." *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 7.7 & cmt. b (AM. LAW INST. 2000); BRUCE & ELY, *supra* note 32, §§ 7:18, 10:25; POWELL ON REAL PROPERTY, *supra* note 34, § 34.21[1]. Thus, partial extinguishment is simply part of the doctrine of extinguishment by prescription governed by the regular rules of extinguishment; it is not a new doctrine.

Second, the parties were given the opportunity to address in detail the application of partial prescription to the facts of this case. We ordered the parties to file supplemental briefing as follows:

1. Should Alaska adopt the doctrine of partial extinguishment of an easement by prescription? Why or why not?

2. Regardless of the answer to question 1, what are the elements of partial extinguishment by prescription, and under what circumstances have courts applied this doctrine?

3. Should this doctrine apply to the case at bar? Why or why

(continued...)

# V.    CONCLUSION

We AFFIRM the superior court's conclusion that the 1986 deed created an easement appurtenant and AFFIRM its finding and conclusion that the gold plant extinguished that part of the easement it occupied.  We REVERSE the court's finding

---

[50](...continued)
> not?

The parties responded and agreed that if this court adopted partial extinguishment, then the standard set forth in *Hansen* should apply.

Third, the dissent argues that if the parties knew that partial extinguishment was in play at trial, they might have focused their presentation of evidence on more particular parts of the easement to demonstrate whether those parts were extinguished. But at trial Reeves's overall position was that there had been *no* prescription, so he presented evidence and testimony to show as little interference with the easement as possible.  Godspeed, on the other hand, contended that the *entire* easement was extinguished and accordingly presented evidence and testimony to show as much interference with the easement as possible.  In other words, both parties had every incentive to offer all of the evidence available to them to prove their respective positions; all of that evidence relevant to total extinguishment or no extinguishment necessarily encompassed all evidence of partial extinguishment.  Notably, neither party requested in their supplemental briefing to this court that the case be remanded to the superior court so additional evidence could be presented on the issue of partial extinguishment, nor did they argue that the superior court's factual findings were insufficient.

Fourth, the dissent suggests that "extensive activity" should not be required to show unreasonable interference in this case because, unlike in *Hansen*, the easement holder used the easement.  The superior court required a showing of extensive activity in this case because the social relationship of the parties made adversity difficult to determine.  We agree with the superior court.  And under any standard, equipment, conveyor belts, and sand, gravel, and sewer rock in mining country do not rise to the level of unreasonable interference sufficient to terminate an easement.  *See* BRUCE & ELY, *supra* note 32, § 10:25.  We reiterate, apart from the gold plant no evidence was admitted and no testimony established that any equipment, conveyer belts, sand, gravel, or sewer rock remained in place and obstructed the easement for a ten-year period.

and conclusion that the remainder of the easement apart from the location of the gold plant was terminated and REMAND for further proceedings consistent with this opinion.

FABE, Chief Justice, with whom CARNEY, Justice, joins, dissenting in part.

I disagree with the court's analysis and its conclusion that the superior court erred in finding that the entire easement over the Ellingsons' property was terminated by prescription. The court's decision is based on a theory of partial extinguishment of the easement, a theory that was never considered by the superior court. As a matter of procedural fairness, this court should remand to the superior court for the parties to have an opportunity to present additional evidence on this new, fact-intensive theory. And, in my view, even under a partial extinguishment theory, the superior court correctly concluded that the entire easement was extinguished. I therefore agree with the court's conclusion that the part of the easement under the gold plant was extinguished, but I respectfully dissent from the court's decision that the remainder of the easement was not also extinguished.

I.    **PRINCIPLES OF PROCEDURAL FAIRNESS PROHIBIT REVERSAL ON NEW GROUNDS WITHOUT AN OPPORTUNITY TO BE HEARD.**

Neither party raised the question of partial extinguishment of the easement in the trial court, nor did the superior court address the question in its ruling. Importantly, the parties had no reason to believe that the issue of partial extinguishment would be addressed because none of our prior decisions have adopted or even considered that doctrine. *Hansen v. Davis* remains the only Alaska case that has addressed the question of extinguishment by prescription,[1] and that decision made no mention of the possibility of partial extinguishment by prescription despite a similar fact pattern where one portion of the easement was occupied by permanent improvements and another portion was occupied by more temporary improvements.[2] So by basing its decision on

---

[1]    220 P.3d 911, 915-16 (Alaska 2009).

[2]    *Id.* at 913-14.

-23-                                                                  7219

partial extinguishment, the court adopts a doctrine that is new to Alaska law without giving the parties an opportunity to litigate this issue in the trial court. Procedural fairness requires that parties be given an adequate hearing, which includes the principle that "[p]arties must have notice of the subject of proceedings that concern them 'so that they will have a reasonable opportunity to be heard.' "[3]

In *Price v. Eastham* we considered this issue in a context very similar to that of the current case.[4] There, a group of snowmachiners brought suit against a landowner, claiming that they had established a prescriptive easement over part of the land by using the same trail consistently since the 1950s.[5] Price, the landowner, argued that an easement had not been perfected and counterclaimed for injunctive relief against the snowmachiners.[6] Instead of ruling on the prescriptive easement question, the superior court initially held that an easement had been established under former 43 U.S.C. § 932 (also known as RS 2477), under which sufficient public use of certain types of land could establish a self-executing grant of land from the federal government.[7] Neither party had raised this issue before the superior court.[8] On appeal, we held that the superior court violated Price's due process rights by ruling on an issue that Price did not have an opportunity to litigate:

---

[3]     *Price v. Eastham*, 75 P.3d 1051, 1056 (Alaska 2003) (quoting *Potter v. Potter*, 55 P.3d 726, 728 (Alaska 2002)).

[4]     75 P.3d 1051.

[5]     *Id.* at 1054.

[6]     *Id.*

[7]     *Id.* at 1054-55.

[8]     *Id.* at 1056.

Because Price did not have notice that an RS 2477 right-of-way was at issue, his due process rights were violated. Here, Price did not have an opportunity to be heard on the RS 2477 matter; in fact, he reasonably believed that RS 2477 was not at issue. Accordingly, we hold that the trial court's failure to give Price notice and an opportunity to be heard and to present evidence on the RS 2477 issue at trial violated his due process rights, and we therefore reverse the superior court's finding of an RS 2477 right-of-way on Price's land.[9]

Like the superior court in *Price*, here the court bases its conclusion on a doctrine that the parties did not raise before the superior court.[10] The parties here "did not have an opportunity to be heard on the [partial extinguishment] matter."[11] And like Price, Godspeed "reasonably believed" that partial extinguishment "was not at issue" here[12] because no case in Alaska has previously adopted or even considered that doctrine, nor did the superior court address the issue in its decision.

---

[9]     *Id.*

[10]     Although the issue of partial extinguishment is obviously related to the broader question of extinguishment by prescription, I believe it is properly considered a separate issue here. Its status as a distinct question is particularly relevant in light of the fact that no case in Alaska had previously addressed the question whether the partial extinguishment doctrine is even recognized in this state.

In *Price*, the question of an easement by prescription and an easement under RS 2477 were closely related in that they both required the claimants to show some of the same factual elements. *Id.* at 1056-57. But we concluded that it was a violation of due process to issue a decision on one type of easement when the parties had no notice of that issue. *Id.* at 1056. Under this precedent, it is evident that giving the parties an opportunity to brief and present evidence about a related issue is not sufficient to satisfy the principles of procedural fairness in these circumstances.

[11]     *See id.* at 1056.

[12]     *See id.*

As we have explained, "[b]ecause basic fairness requires an opportunity to present relevant evidence, applying an unanticipated body of law could be an abuse of discretion if doing so were to make different outcome-determinative facts relevant."[13] We have in many contexts remanded cases to the superior court when a novel legal theory was presented in a manner that prevented one or both parties from presenting evidence related to that theory. For example, in a different type of easement case, we remanded the question whether the dedication of an easement had been accepted when "neither party expressly presented the theory of common law dedication to the superior court."[14] And in a case where the superior court allowed amendment of the pleadings after trial to include a breach of contract claim, we vacated and remanded the decision to allow presentation of evidence related to damages for breach of contract because one party had not had the opportunity to present evidence to support its position on damages.[15]

Here, neither the parties nor the superior court raised the issue of partial extinguishment, and the superior court made no factual findings relating to a partial extinguishment theory. The parties accordingly focused their arguments on the simpler question whether the entire easement was extinguished; they might have emphasized different facts or legal arguments had they known that they would need to address the

---

[13]    *Frost v. Spencer*, 218 P.3d 678, 682 (Alaska 2009); *see also Bruce L. v. W.E.*, 247 P.3d 966, 977 (Alaska 2011) (applying the reasoning of *Frost* to reverse a superior court decision that had relied on an issue not raised by the parties).

[14]    *McCarrey v. Kaylor*, 301 P.3d 559, 568 (Alaska 2013).

[15]    *Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 395-97 (Alaska 2001). *See also Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 396 (Alaska 2013) (remanding for further proceedings when trial court's decision relied on new argument made at oral argument on summary judgment without the other party having an opportunity to respond).

question whether separate parts of the easement had been extinguished.[16]  For example, the parties presented some evidence about rock piles and other equipment or structures incidental to the gold plant that interfered with use of the easement.  The superior court did not make detailed findings about those other obstructions, considering them part of the plant's operation, which it determined sufficiently interfered with the prospective use of the easement as a public means of ingress and egress to extinguish the entire easement.[17]  As we have concluded in analogous situations, adopting a partial extinguishment theory here means the court is "applying an unanticipated body of law" that might "make different outcome-determinative facts relevant."[18]  The fact that the parties did not have an opportunity to address this issue or present facts relevant to this theory before the superior court, therefore, creates a procedural fairness problem.

Because the court has concluded that the partial extinguishment doctrine applies to this case, I believe it is most appropriate to remand this fact-specific inquiry to the superior court for an opportunity for presentation of additional evidence on this theory and for the superior court's determination whether the easement was partially or fully extinguished.  This is the approach we have followed in other cases involving fact-

---

[16]    *Cf. Frost*, 218 P.3d at 682 (considering whether the court's application of a different body of law "would, if announced at the outset of the trial, have reasonably led [the parties] to present different evidence or to place more emphasis on some of the evidence that [they] did present").

[17]    *See Hansen v. Davis*, 220 P.3d 911, 915 (Alaska 2009) (holding that easement may be extinguished when owner of servient estate "unreasonably interferes with the current *or prospective* use of the easement" (emphasis added)).

[18]    *Frost*, 218 P.3d at 682.

intensive easement issues,[19] and I believe we should adhere to that established practice here.

## II. EVEN UNDER A PARTIAL EXTINGUISHMENT THEORY, THE SUPERIOR COURT DID NOT CLEARLY ERR.

But even if it were appropriate to decide this case on the factual record developed below — without providing an opportunity for the parties to present evidence now that they know that the doctrine of partial extinguishment applies — I would affirm the superior court's decision. I agree with the court's conclusion that the portion of the easement under the gold plant was extinguished, but I disagree with its conclusion that the remainder of the easement was not also extinguished. We held in *Hansen* that "permanent and expensive improvements that are difficult and damaging to remove will trigger the prescriptive period."[20] Here, the superior court found that the gold plant was a steel and concrete structure that cost nearly a million dollars to install, while other temporary improvements at times occupied and interfered with the remainder of the easement. The superior court focused its analysis on the way these and other

---

[19] We remanded for further fact-finding in *Price* after reviewing the superior court's conclusion that a prescriptive easement had been created (a conclusion the superior court had reached independent of the RS 2477 easement question discussed above). *See Price v. Eastham*, 75 P.3d 1051, 1059 (Alaska 2003). We noted that the superior court had not "define[d] the extent of the prescriptive easement over Price's land" and therefore we "remand[ed] for a determination of the scope of this easement" rather than answering that question ourselves. *Id.*

In *Hansen*, similarly, after deciding the issue of prescriptive extinguishment we were left with the question whether the easement had been effectively transferred to new owners. 220 P.3d at 918. We remanded this issue for further factual findings, explaining that "[q]uestions concerning a property's chain of title are often fact-intensive, and the trial court is in the best position to address questions of fact." *Id.* Accordingly, we "decline[d] to decide this issue as a matter of law and remand[ed] for a hearing on the quiet title action." *Id.*

[20] *Hansen*, 220 P.3d at 917.

improvements interfered with public access to the easement. An easement can be extinguished by use that interferes with a prospective use of it,[21] and Reeves currently intends to use the easement for a public road. I would therefore conclude that the entire easement was extinguished, even if each part of the easement is considered separately under a partial extinguishment theory.

The creation or extinguishment of an easement by prescription presents questions of both law and fact:[22] The relevant findings of fact are reviewed for clear error,[23] and the application of law to these facts is reviewed de novo.[24] But we clarified in *Hansen* that for the specific question of "[d]etermining what constitutes unreasonable interference, and thus triggers the prescriptive period" for extinguishing an easement by prescription, the analysis "will be heavily fact dependent."[25]

In *Hansen* we held that "[a]s a matter of law, the maintenance of a garden on the easement area did not constitute an improvement sufficiently adverse to commence the prescriptive period."[26] Here, the court relies heavily on *Hansen* to conclude that "cars, equipment, and gravel piles are not significantly less moveable than a garden" and that therefore those impediments were insufficient to extinguish the

---

[21]     *Id.* at 915.

[22]     *See* Op. at 8 (citing *HP Ltd. P'ship v. Kenai River Airpark, LLC*, 270 P.3d 719, 726 (Alaska 2012)).

[23]     *See* Op. at 8 (citing *HP Ltd. P'ship*, 270 P.3d at 726).

[24]     *See* Op. at 8 (citing *HP Ltd. P'ship*, 270 P.3d at 726).

[25]     *Hansen*, 220 P.3d at 917.

[26]     *Id.*

easement by prescription.[27]    But in *Hansen* we considered only the garden and vegetation; we did not consider the effect of the greenhouse occupying the other portion of the easement because the prescriptive period of ten years had not yet elapsed since the greenhouse was built.[28]    And in *Hansen*, we never held that a permanent building constructed on part of an easement is insufficient to extinguish the entire easement.  If the easement is considered as a whole, then a gold plant occupying roughly half of the easement would easily satisfy the *Hansen* test for prescriptive extinguishment: "[P]ermanent and expensive improvements that are difficult and damaging to remove will trigger the prescriptive period."[29]    A gold plant consisting of a steel and concrete structure that cost almost a million dollars to install[30] surely qualifies as a "permanent and expensive improvement" under *Hansen*.

Applying this reasoning to the partial extinguishment theory, the superior court was almost certainly correct to conclude that the portion of the easement under the gold plant was extinguished.[31]    The superior court was also correct to conclude that the gold plant extinguished the entire easement when the plant is viewed *in conjunction with* the more temporary improvements occupying much of the remainder of the easement and the current proposed use of the easement as a public road.  Once the gold plant permanently blocked half of the easement, the rock piles and equipment impeded a large

---

[27]    Op. at 17.

[28]    *Hansen*, 220 P.3d at 917-18.

[29]    *Id.* at 917.

[30]    Op. at 5.

[31]    Op. at 16.

portion of the remaining passable land, thereby "unreasonably interfer[ing]"[32] with and extinguishing that portion of the easement.

Even considering each portion of the easement entirely separately, the superior court's findings were not clearly erroneous in concluding that the portion of the easement not covered by the gold plant was still extinguished under our *Hansen* test. Eagan testified that he may have been forced to drive outside the edges of the easement at times, because parts of the easement were blocked. Thus, the superior court did not clearly err in finding that Eagan could not always drive the entire length of the easement, even if he was sometimes able to drive next to the plant. Nor did it clearly err in finding that the general public could not safely use the easement while the gold plant intruded into it. Therefore, the superior court was correct to conclude that this portion of the easement was extinguished, even when considered separately from the gold plant portion.

An easement can be extinguished by prescription if the servient owner's use "unreasonably interferes with the current or prospective use of the easement by the easement holder."[33] There is no indication that the superior court clearly erred in finding that the gold plant's operation "unreasonably interfered with a prospective dedication of the easement to the public." Indeed, the prospective use of the easement for a public road was a factor the superior court considered at several points, noting that at the times when a single vehicle could navigate the easement, it "would not be safe for the general public" to do so. The superior court also found that additional efforts were made to restrict access by the general public even if Eagan could drive around barriers to access Alaska Gold's property.

---

[32]  *See Hansen*, 220 P.3d at 915.

[33]  *Id.* at 916.

Moreover, the nature of the other impediments and blockages is sufficient to establish that the non-gold-plant portion of the easement was extinguished. In setting out the standards for termination by prescription under Alaska law, we explained in *Hansen* that the doctrine of extinguishment by prescription relies on the longstanding property law principle of encouraging property owners to protect their rights: "When satisfied, the various requirements of adverse possession, and similarly prescription, serve to 'put [the property owner] on notice of the hostile nature of the possession so that he [or she], the owner, may take steps to vindicate his [or her] rights by legal action.' "[34] In light of this principle, we concluded that "[u]se of the easement that unreasonably interferes with the 'easement owner's enjoyment of the easement' is adequate 'to give notice that the easement is under threat.' "[35] Accordingly, we explained that "[w]here the easement holder has not used the easement for some time, or at all, the servient estate owner enjoys wide latitude with respect to use of the easement area, and a showing of extensive activity will be required to demonstrate adversity."[36] The converse of this statement is that an easement may be extinguished if the easement holder knew of the other party's adverse use and did nothing to stop it.

In *Hansen*, it was "undisputed that the easement was unused by an easement holder from its creation until [the time of the lawsuit]."[37] Thus, by *Hansen*'s own standard, it would have required a demonstration of "extensive activity" to meet the

---

[34] *Id.* (first alteration in original) (footnote omitted) (quoting *Peters v. Juneau–Douglas Girl Scout Council*, 519 P.2d 826, 832 (Alaska 1974)).

[35] *Id.* (quoting 7 THOMPSON ON REAL PROPERTY § 60.08(b)(7)(i) (David A. Thomas ed., 2004)).

[36] *Id.* at 917.

[37] *Id.*

unreasonable interference test in that case; we found that the claimants had failed to make this showing. In the current case, by contrast, the parties agree that Eagan, the local representative of the easement holder, repeatedly used the easement during the period of the Ellingsons' adverse use. Yet neither Eagan nor Alaska Gold took any action to halt the Ellingsons' use. As the superior court pointed out, "the parties were not protective of their property rights."

In fact, the use of the easement in this case was more extensive than in *Hansen*: In contrast to the garden beds in *Hansen*, the easement here was occupied by equipment and rock piles that sometimes blocked large portions of the easement.[38] So contrary to the court's conclusion, the fact that a garden failed the "unreasonable interference" test in *Hansen* does not mean that similar (and even more extensive) use of the easement would fail the test in the current case, where the easement holder knew of the interference and did nothing to protect its rights. Accordingly, the extensive interference caused by the rock piles and heavy equipment here satisfies the "unreasonable interference" test — even when considered independently from the portion of the easement occupied by the gold plant. I would therefore hold that the superior court did not clearly err in concluding that the entire easement was extinguished by prescription.

For these reasons, I respectfully dissent from the court's decision to reverse a portion of the superior court's decision. I believe that the proper course of action in this case is to remand to the superior court to allow the parties to supplement their evidentiary presentations now that they know that the doctrine of partial extinguishment is the law in Alaska. Here, the newly adopted legal doctrine, "if announced at the outset

---

[38] Unlike the garden in *Hansen*, some rock piles here were not easily removed: "[P]retty good size equipment" would have been needed to move them; they could not be moved "by hand."

of the trial, [would] have reasonably led [the parties] to present different evidence or to place more emphasis on some of the evidence that [they] did present."[39] But even if we are to decide the case on the current record, I would affirm the superior court's factual finding that the majority of the easement was blocked and that the entire easement was extinguished.

---

[39] *Frost v. Spencer*, 218 P.3d 678, 682 (Alaska 2000).



Old Steese Highway

MS-1724

MS-1709

Gold
Plant

Easement

Byrne Fraction

MS-1709

Elevated
Footbridge

MS-851
"Gold Dredge 8"

Appendix 1      **7219**