*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RAY M. COLLINS and CAROL J. COLLINS, | ) ) ) | Supreme Court No. S-16795 |
| Appellants, | ) ) | Superior Court No. 1JU-14-00771 CI |
| v. | ) ) | O P I N I O N |
| DAVID W. HALL and MARGARET R. HALL, as Trustees of the D&M Hall Community Property Trust, dated March 14, 2005, | ) ) ) ) ) | No. 7410 – September 27, 2019 |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Joseph W. Geldhof, Law Office of Joseph W. Geldhof, Juneau, for Appellants. Lael A. Harrison, Faulkner Banfield, P.C., Juneau, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

CARNEY, Justice.

## I. INTRODUCTION

This case concerns a boundary dispute between the Collinses and the Halls, who are adjoining property owners in a recreational subdivision on an island near Juneau. The Collinses alleged that structures on the Halls' property encroached onto the

Collinses' property and violated the subdivision's restrictive covenants. They brought claims for quiet title and trespass based on boundaries recorded in a 2014 survey of their lot. This survey was prepared by the same surveyor who had initially platted the subdivision in the mid-1970s; the 1970s survey in turn referred to a survey monument established in 1927.

The Halls responded that the Collinses' surveyor had used the wrong point of beginning for his subdivision survey; that a surveyor they had hired in 2012 found the true point of beginning based on the 1927 survey; that the correct property boundary lay some distance from where the Collinses claimed; and that the supposedly encroaching structures were fully on the Halls' land. The Halls argued that their proposed boundary line conformed accurately to the recorded documents and deeds while the Collinses' did not. The superior court found that the boundary advocated by the Halls was correct and issued a judgment quieting title based on their 2012 survey, though it acknowledged that its decision could cloud title for other property owners on the island. The court also found that the restrictive covenants at issue had been abandoned and concluded they could not be enforced against the Halls.

We conclude that the superior court's findings as to the boundary location and restrictive covenants were not clearly erroneous, and we therefore affirm the court's decision on those issues. But because the superior court's findings and conclusions did not address one of the Collinses' trespass claims, we remand for consideration of that issue.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Carol and Ray Collins own property designated as Lot 14, Area 1, in the Colt Island Recreational Development subdivision on Colt Island, near Juneau. David

and Margaret Hall, as trustees of the D&M Hall Community Property Trust, own adjoining land designated as Lot 15, Area 1, in the same subdivision.

The Collinses acquired title to their property by deed in 1990 and co-owned it with another family until 2013, when the co-owners deeded their interest to the Collinses.[1] Their 2013 deed, which they recorded, identifies their property as: "Lot 14, Area 1, Colt Island Alaska Recreational Development, according to Plat No. 75-11, U.S. Survey No. 1755, Juneau Recording District, First Judicial District, State of Alaska."

The Halls acquired title to their lot by deed in 1994 and recorded their deed shortly afterward. In 2005 they transferred the property to a community property trust and again recorded the deed. Their deed, like the Collinses', identifies their property as: "Lot Fifteen (15), Area One (1), Colt Island Recreational Development according to Plat 75-11, U.S. Survey 1755, Juneau Recording District, First Judicial District, State of Alaska."

The Collinses and Halls each have a cabin on their lot. The Halls' property also has a separate "shop" building, which they built, and an outhouse built by Lot 15's previous owner. The parties dispute the location of the boundary line between their properties and whether the shop and outhouse encroach onto the Collinses' property. Both lots are also close to a right of way known as Totem Pole Trail, though the exact location of the lot boundaries relative to the trail is disputed.

Each party's deed states that the party's lot is subject to any recorded easements and restrictive covenants. These include a June 1976 declaration of protective covenants for the entire subdivision. At issue are Covenant 5 of the declaration, which requires a 20-foot setback from any lot line for "[a]ll cabins, buildings, and storage

---

[1] They apparently shared the lot with another family until that family deeded their interest in the property to the Collinses in 2013.

facilities of any type," and Covenant 9, which requires all toilet facilities to have a "self-contained chemical holding tank" and to comply with state and federal waste disposal regulations.

Because much of this case centers on the various surveys done on Colt Island and on the discrepancies among them that gave rise to the boundary dispute, a summary of relevant surveys, along with the monuments and markers associated with them and the boundaries they purport to establish, is useful.

### 1. U.S. Survey 1755

Colt Island was first surveyed in 1927 by Fred Dahlquist, a surveyor for the then-existing General Land Office, when the federal government conveyed the entire island to a private owner as a homestead. Dahlquist's survey, titled U.S. Survey 1755, used an existing survey marker on nearby Admiralty Island, USLM 1285, as a reference point.[2] His field notes provide a bearing and distance from USLM 1285 to his beginning point on the northwest corner of Colt Island, which he designated as "Cor. No. 1. M.C."[3] The superior court referred to this point as "Meander Corner 1." Because Meander Corner 1 was an "unsafe place" to set a monument — vulnerable to erosion or submersion — Dahlquist established a "witness corner" on a rock a short distance from

---

[2]     Surveyor John W. Bean, who later surveyed Colt Island and platted the subdivision, testified that USLM stands for "United States location monument" or "United States land monument" and refers to a permanent monument, usually marked by a heavy brass or aluminum cap, established in a public land survey as a reference for subsequent surveys of the surrounding area.

[3]     According to Bean, "M.C." stands for "meander corner," or a corner where meander lines meet. A meander line on a survey marks the mean high tide line of a shoreline or water body boundary; because tides vary, a meander line may not reflect the actual high tide line at a later date, but it may still be used to determine property boundaries and areas for legal purposes.

Meander Corner 1.[4]  According to his field notes, he marked the rock with a cross and the letters "WC MC1 S1755," to stand for "Witness Corner to Meander Corner 1" of U.S. Survey 1755.  He also established witness corners on two spruce trees nearby, but these had apparently been cleared by the time later surveys were done.  U.S. Survey 1755 shows meander lines for the entire perimeter of Colt Island but does not subdivide the island's interior.  Based on the survey field notes, the distance between WCMC1 and USLM 1285 is 3,814.61 feet, and the bearing is N31º24′42″E.[5]

### 2.    Plat 75-11

In the mid-1970s, the owners of Colt Island partnered with a developer to subdivide the island for recreational use and sale.  The developer hired surveyor John W. Bean to perform a survey and create a subdivision plat, intending to create 100-by-150-foot beachfront lots to sell as cabin lots.

Bean began his surveying work in 1974.  Because Dahlquist had not monumented Meander Corner 1, Bean instead attempted to find Dahlquist's witness corner, WCMC1.  He later testified that he could not find a rock carved with the labels listed in Dahlquist's field notes, but he did eventually find a rock that appeared to be marked with a "fine X," which he "accepted to use" as the survey's point of beginning, believing it to be WCMC1.  Starting from this point, Bean set up a number of "control points," or reference markers — generally rebar stakes that he would label or cover with

---

[4]     Bean testified that if a monument cannot be set at the referenced point or is set at an unstable location, a witness corner is a point that refers by bearing and distance to the point where another monument is or should be.

[5]     The bearing indicates that, from USLM 1285, the direction of WCMC1 is 31º24′42″ east of north.  The field notes do not give this distance or bearing; however, they provide the distance and bearing from USLM 1285 to Meander Corner 1 and from Meander Corner 1 to WCMC1.  The distance and bearing between USLM 1285 and WCMC1 can therefore be mathematically calculated.

a plastic or aluminum cap — for the planned subdivision. These control points were placed merely to assist Bean with completing his survey; he did not intend them to be survey monuments that future surveyors could use as references, and he later testified that monuments, unlike temporary control points, should be identifiable by name or description and durable enough to last a number of years. As part of this initial work, Bean and the developer also had loggers clear Totem Pole Trail, which was planned as a 20-foot-wide right of way along the western side of the island; the developer had an extra five feet cleared on either side of the trail.

In 1975 Bean recorded a plat of the subdivision, Plat 75-11. Plat 75-11 was a "paper plat," meaning that it did not record any field work or new monumentation.[6] Instead it referred to U.S. Survey 1755 and its associated monuments.

### 3. Informal survey by David Hall in 1999

David Hall performed an "informal survey" of his own lot in August 1999 to try to determine his property lines in preparation for expanding his cabin. He testified that when he bought the property, "[n]obody really knew exactly where the property lines were," but "it didn't seem to be a problem" because "everybody was friends." He started his survey from a stake at what he believed was a corner of Lot 18, three lots away from his property; he apparently assumed this stake was from the "original survey." Measuring 300 feet from the stake on Lot 18, he found a partially rotted stake

---

[6] The surveyors who testified at trial agreed that at the time, state law allowed Colt Island, as part of an unorganized borough, to be subdivided for sale and development based on a paper plat that was not field-surveyed or recorded. This remained true until 1998 when the Alaska legislature passed AS 40.15, requiring subdivision plats in unorganized boroughs to be approved by the Department of Natural Resources and imposing monumentation requirements for those subdivisions. Ch. 40, § 10, SLA 1998; *see* AS 40.15.305 (requiring approval of plats); AS 40.15.320 (requiring monumentation).

at what he believed was the northeastern corner of his lot, Lot 15. He assumed this too "was from the original survey" and replaced it with a piece of rebar. He then placed additional stakes where he believed the boundary between Lot 15 and Lot 14 lay. The drawing he created afterward indicates that, according to the boundaries he marked, a generator shed on the Collinses' property — which at the time they co-owned with another family — encroached a few feet onto the Halls' property. This shed was later removed. The Halls' shop and outhouse lay fully within Lot 15 according to the boundaries Hall determined. When doing his survey, Hall apparently looked for but could not find WCMC1.

### 4. Survey work by Bean in 2009

Bean, the surveyor who created Plat 75-11, performed additional surveys of various lots in the subdivision between the 1970s and the 2000s. Notably, in 2009 he was asked to survey multiple lots, including the Collinses'. In the course of that survey he placed markers on what he believed to be the corners of Lot 14, the Collinses' property. He determined the corner locations based on corners he had previously placed on a neighboring lot, which in turn were based on the control points he had set in the 1970s. The boundaries Bean marked in 2009 were different from those Hall had found in 1999 by roughly ten feet. Bean did not attempt to locate Meander Corner 1 or WCMC1 and did not record any surveys of Colt Island at the time.

### 5. Plat 2012-32

In 2012, a few months after the co-owner of the Collinses' lot died, the Collinses apparently notified the Halls that the Halls' shop and outhouse were encroaching over the boundary Bean had marked and threatened to sue. In response the Halls hired R&M Engineering, Inc., to perform and record an "as-built survey" of their lot showing "all of [the Halls'] buildings in relationship to the property lines." Hall

believed that R&M's survey would "supersede[] what [he] did" in 1999, as Hall was not a licensed surveyor and had not recorded any of his work.

Surveyor Mark Johnson, who led the R&M survey crew but did not personally visit Colt Island, reviewed Dahlquist's U.S. Survey 1755 and his field notes, as well as Plat 75-11, prior to beginning his survey. He instructed his survey crew to follow U.S. Survey 1755 as closely as possible, including searching for the monuments to which Dahlquist's field notes referred. According to Johnson, his crew began by measuring the bearing and distance given in Dahlquist's field notes from USLM 1285 to Meander Corner 1. Johnson indicated that his crew "had no problem finding" a rock engraved with a cross and the letters "WCMC1 S1755," which they took to be WCMC1. They determined this monument to be 3,813.49 feet from USLM 1285, at a bearing of N31º24′42″E. This bearing matched the bearing calculated according to Dahlquist's field notes; the distance is roughly one foot off. Starting from this point, R&M's crew located the Halls' lot based on information in Plat 75-11. Johnson stated that Plat 75-11 on its own was not sufficient to locate any specific subdivision lot because it did not record any monuments being set; it had to be used in conjunction with U.S. Survey 1755.

Based on this survey, R&M filed a record of survey, Plat 2012-32. The boundaries of Lot 15 on Plat 2012-32 are roughly 20 feet west and 16 feet south of where Bean's 2009 survey placed them. Based on the Plat 2012-32 boundaries, both the outhouse and shop are fully within the Halls' lot and sit at least 15 feet from the boundary with the Collinses' lot.

### 6. Plats 2014-46 and 2015-37

In July 2014 the Collinses filed suit against the Halls. Shortly afterward, they requested another survey from Bean. He filed a record of survey, Plat 2014-46, confirming the boundaries he had set in 2009. Bean did not go back to look for Meander

Corner 1 or WCMC1 while creating Plat 2014-46, though he did compute a location for WCMC1 and mark it on the record of survey.

The following year Bean amended Plat 2014-46 and recorded the amendment as Plat 2015-37. For the amended survey, Bean's point of beginning was a monument he placed at a location he believed to be Meander Corner 1. He based this determination on his continued assumption that the rock with the faint "X" he had located in the 1970s was WCMC1. The amended plat showed a slightly different bearing for Meander Corner 1 than Plat 2014-46 and included an icon marking Bean's assumed WCMC1, but did not change the boundary between Lot 14 and Lot 15 as determined by Plat 2014-46. The Collinses assert that this is the correct boundary. According to Plat 2015-37, Meander Corner 1 is 3,841.62 feet from USLM 1285 at a bearing of S31º13′04″W.[7] This bearing closely coincides with that given in the field notes to U.S. Survey 1755, S31º13′W, but the distance is about 22 feet longer. There are also discrepancies between Plat 2015-37 and Plat 75-11 in the bearings and distances of the meander lines between Meander Corner 1 and Lot 14.

### B.    Proceedings

#### 1.    Pretrial proceedings

The Collinses filed their complaint for quiet title and trespass against the Halls in superior court in July 2014. They also sought declaratory judgments to: (1) confirm the boundary lines they claimed Bean had monumented in 2009 and (2) find the Halls in violation of the restrictive covenants imposing setback restrictions and sewage disposal requirements. They alleged that the Halls' shop and outhouse encroached onto

---

[7]    Plat 2012-32 and Plat 2015-37 use slightly different conventions for giving bearings. Plat 2012-32 records the bearing looking northeast from USLM 1285 to WCMC1, while Plat 2015-37 records the bearing looking southwest from its purported Meander Corner 1 to USLM 1285.

Lot 14 and that the outhouse dumped sewage "directly into a hole in the ground" instead of into a holding tank as required by the covenants. They based their trespass claim both on the Halls' outbuildings and on an allegation that the Halls had personally trespassed onto the Collinses' land.

The Halls filed an answer the following month, denying that their structures encroached on the Collinses' land, alleging that Bean had never surveyed or monumented the property boundaries, and raising a number of affirmative defenses. The Halls counterclaimed alternatively that Plat 2012-32 established the correct boundaries and that they were entitled to possession of the disputed land by adverse possession. Finally, they sought declaratory judgments that they had not violated the restrictive covenants governing set-backs and sewage disposal based on "inconsistent compliance" by other lot owners in the subdivision. The Collinses answered the Halls' counterclaims in September 2014, raising various affirmative defenses.

### 2.    Independent review of surveys

In late 2015, in the course of settlement negotiations, the parties arranged to have another surveyor, John Bennett, independently review the relevant documents and provide a written opinion on the boundary location. Bennett worked for R&M Consultants, an Anchorage-based company that is separate and independent from R&M Engineering, which produced Plat 2012-36. Despite later disputes about the scope of Bennett's work and whether either party could call him as an expert at trial, he was eventually permitted to testify.

Bennett submitted his report in December 2015. He opined that because Plat 75-11 did not reflect a monumented field survey but rather adopted the bearings and distances of U.S. Survey 1755, the boundaries of Lots 14 and 15 depended on U.S. Survey 1755. He concluded that Plat 2012-32, which surveyor Johnson had created at the Halls' request, "most accurately represents the record location of the boundaries for

Lot 15, Area 1 according to the Colt Island subdivision (Plat 75-11)." He determined that the monuments Bean set in 2009 did not meet the requirements for original subdivision monuments and thus could not control. He also concluded that the boundaries in Plat 2014-46 had not been established by acquiescence,[8] adverse possession,[9] or estoppel.[10]

### 3. Bench trial

A bench trial was held over four days in late November and early December

---

[8] *See Lee v. Konrad*, 337 P.3d 510, 520 (Alaska 2014) ("[A] boundary line is established by acquiescence where adjoining landowners (1) whose property is separated by some reasonably marked boundary line (2) mutually recognize and accept that boundary line (3) for seven years or more."). Bennett concluded that this doctrine did not apply because there was no mutual acceptance of the boundary line Bean set in 2009 and in any case the required time period had not run.

[9] AS 09.45.052(a) provides:

> The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more, or the uninterrupted adverse notorious possession of real property for 10 years or more because of a good faith but mistaken belief that the real property lies within the boundaries of adjacent real property owned by the adverse claimant, is conclusively presumed to give title to the property except as against the state or the United States.

Bennett determined that adverse possession did not apply because Bean's boundary had only been marked since 2009, less than seven years.

[10] *See Beecher v. City of Cordova*, 408 P.3d 1208, 1214 (Alaska 2018) ("Equitable estoppel requires proof of three basic elements: (1) 'assertion of a position by conduct or word,' (2) 'reasonable reliance thereon,' and (3) 'resulting prejudice.' " (quoting *Jamison v. Consol. Utils., Inc.*, 576 P.2d 97, 102 (Alaska 1978))). Bennett concluded that estoppel could not apply because the Halls had never asserted that the Bean monuments reflected the correct boundary, and so the Collinses could not have been prejudiced by reliance on such an assertion.

2016.  Much of the testimony at trial centered on the various surveyors' attempts to locate the monument that Dahlquist had designated as WCMC1 in 1927.  The court heard testimony from Bean and Johnson, as well as from Randal Davis, another surveyor who had been hired in August 2008 to survey a lot near the Collinses' and Halls' lots.

Various other property owners on Colt Island also testified, stating that if the court determined the lot boundaries according to R&M's Plat 2012-32, it might cloud their title and require them to move their buildings, accesses, and trails.  They testified that they had never seen the inscribed rock that Johnson used as WCMC1 until a few years prior to trial, apparently suggesting that the monument had been planted or carved more recently than 1927.  The court also heard testimony from the Halls' predecessor in title, George Fisher, who stated that he was unsure of the exact boundaries of Lot 15 when he bought it and built his cabin.

In December 2016 the court issued a decision on the record in favor of the Halls, followed by written findings and conclusions in July 2017.  The court found that Bean's surveys contained "significant discrepancies" and that he had identified the wrong point of beginning as WCMC1 in the 1970s.  After finding that R&M's Plat 2012-32 used the correct point of beginning — "a monument engraved with a cross and the letters 'WCMC1 S1755' — the court found that Plat 2012-32 "accurately depicts the boundary between Lots 15 and 14."

The court also concluded that the Collinses had not established any grounds for adopting their Plat 2014-46 in contradiction of the written descriptions on Plat 75-11 and U.S. Survey 1755.  Applying a clear and convincing evidence standard, the court concluded that no boundary had been established by acquiescence, and that "[no] other equitable doctrine . . . would warrant altering the property boundaries."  Finally, the court found that the restrictive covenants governing setbacks and sewage disposal had effectively been abandoned, as other property owners had maintained outhouses and

built structures less than 20 feet from their lot boundaries.  The court concluded that it would therefore be inequitable to enforce the covenants against the Halls.

In July 2017 the court issued a final judgment quieting title in the Halls' favor according to the boundaries in their Plat 2012-32.  The Collinses moved for reconsideration, arguing that the court had ignored a legal doctrine from an 1878 Michigan case stating that survey monuments that had been set and relied upon should govern, even if the original survey was erroneous.[11]  They argued that under this doctrine, Bean's use of the rock with the faint "X," when he was creating Plat 75-11 in the 1970s, should control the location of the subdivision lots.  The court denied reconsideration shortly afterward, stating that the theory the Collinses relied on was in fact a version of the doctrine of boundary by acquiescence, which the court had already concluded did not apply.

The Collinses appeal.

## III.    STANDARD OF REVIEW

"[W]e review legal questions de novo" and adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[12]  "Whether a deed or plat is

---

[11]    *Diehl v. Zanger*, 39 Mich. 601, 605 (1878) (Cooley, J., concurring) ("The question is not how an entirely accurate survey would locate these lots, but how the original stakes located them.").  Justice Cooley's concurring opinion stated that a subsequent surveyor's task was therefore to attempt to find the original monuments, and if they were "no longer discoverable," attempt to derive their original location from "the practical location of the [boundary] lines," for instance by considering fences or visible markers.  *Id.*

[12]    *Estate of Smith v. Spinelli*, 216 P.3d 524, 528 (Alaska 2009) (quoting *Pastos v. State*, 194 P.3d 387, 391 (Alaska 2008)).

ambiguous is a question of law" reviewed de novo.[13] We review factual findings for clear error, reversing the trial court's findings "only when, 'after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made.' "[14] "[T]he determination of a disputed boundary often presents a compound issue involving questions both of law and fact."[15] While the "relative weight of different types of evidence of disputed boundaries ordinarily presents a question of law, . . . the credibility of witnesses, including the weight given the opinions of surveyors, the location or existence of physical markers, and the timing of events, are questions of fact."[16] We accord the superior court's factual findings "particular deference . . . when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence."[17] "Whether there are sufficient findings for informed appellate review is a question of law."[18]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Concluding That The Boundaries Recorded In Plat 2012-32 Were Correct.

The Collinses argue that this case turns on "the choice the trial court made about which surveyor's work product" deserved priority in setting boundary lines: the

---

[13] *Reeves v. Godspeed Props., LLC*, 426 P.3d 845, 849 (Alaska 2018).

[14] *Lee v. Konrad*, 337 P.3d 510, 517 (Alaska 2014) (quoting *Peterson v. Ek*, 93 P.3d 458, 463 (Alaska 2004)).

[15] *Id.*

[16] *Id.*

[17] *Safar v. Wells Fargo Bank, N.A.*, 254 P.3d 1112, 1117 (Alaska 2011) (quoting *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010)).

[18] *State v. Schmidt*, 323 P.3d 647, 655 (Alaska 2014) (quoting *Hooper v. Hooper*, 188 P.3d 681, 692 (Alaska 2008)).

"original 1975 subdivision plat" Bean created or Plat 2012-32, which the Collinses claim "shift[s] the entire subdivision boundaries." They argue that in adopting Plat 2012-32 — and its point of beginning, the rock inscribed with "WCMC1 S1755" — the superior court effectively selected "a new survey point of beginning over three decades after the boundaries on Colt Island were established." They contend that the property deeds should control; the deeds' references to Plat 75-11, they argue, require the court to adopt the actual point of beginning Bean used when creating Plat 75-11. They also argue that the court should follow "long-established surveying principles" giving priority to boundaries set by the original surveyor; they contend that Bean "is the original surveyor of the Colt Island subdivision" because he prepared Plat 75-11. They point to the "actual creation and use of access trails . . . [and] construction of cabins on the lots established by Plat 75-11" as evidence of both their own and the Halls' reliance on Bean's boundaries and imply that this would have put a subsequent surveyor on notice of the point of beginning Bean used in the 1970s.

The Halls respond that the Collinses' claim rests not on the deeds but on "an unrecorded error in the 1970s." They argue that the point of beginning for Plat 75-11 is meant to be the witness corner Dahlquist monumented in 1927, as established by "overwhelming" evidence at trial, including Bean's own testimony. They contend that the superior court correctly determined this rock to be the rock inscribed with "WCMC1 S1755" used by Johnson's crew. They argue that Bean's use of the rock with the faint "X" was an error that cannot be controlling on future surveyors because it was not recorded; subsequent surveyors could not have known just based on Plat 75-11 that Bean had used a different rock than Dahlquist. And they point out that the superior court considered the location of Totem Pole Trail but did not find it sufficient to establish the lot boundaries.

### 1. The deeds unambiguously define the subdivision lots according to U.S. Survey 1755.

To determine what land was conveyed to the Collinses and the Halls, we must first look at the deeds. The intent of the parties is "[t]he touchstone of deed interpretation" and will be given effect where possible.[19] We apply a three-step analysis to interpret deeds.[20] First, we "look at the four corners of the document to see if it unambiguously presents the parties' intent."[21] We "need go no further" if the deed " 'taken as a whole' is open to only one reasonable interpretation."[22] However, if the deed is ambiguous, the second step is to consider " 'the facts and circumstances surrounding the conveyance' to discern the parties' intent."[23] Finally, if we cannot discern the parties' intent, we turn to rules of construction.[24]

The Collinses are correct that the deeds are unambiguous and should control, but they are incorrect to conclude that the boundaries established in the deeds are those Bean set and eventually recorded in Plat 2014-46; rather, the boundaries depend on the monuments associated with U.S. Survey 1755. The Collinses' deed — like the Halls' — expressly identifies their lot "according to Plat No. 75-11, U.S. Survey No. 1755." And Plat 75-11, which established no permanent monuments of its own, specifically refers to U.S. Survey 1755 for its point of beginning.

---

[19] *Estate of Smith v. Spinelli*, 216 P.3d 524, 529 (Alaska 2009) (quoting *Norken Corp. v. McGahan*, 823 P.2d 622, 625 (Alaska 1991)).

[20] *McCarrey v. Kaylor*, 301 P.3d 559, 563 (Alaska 2013).

[21] *Id.* (quoting *Estate of Smith*, 216 P.3d at 529).

[22] *Estate of Smith*, 216 P.3d at 529 (quoting *Norken Corp.*, 823 P.2d at 626).

[23] *McCarrey*, 301 P.3d at 563 (quoting *Estate of Smith*, 216 P.3d at 529).

[24] *Id.*

The superior court did not explicitly conclude whether the deeds or the recorded surveys to which they referred were ambiguous, but its analysis of the deeds and surveys reflects an implicit conclusion that they were not:

> Property lines are determined by the property descriptions contained in the deeds, and the instruments referenced in the deeds. In this case, those instruments are Plat 75-11 and U.S. Survey 1755. Because Plat 75-11 does not establish any monuments, the property lines created by Plat 75-11 flow from WCMC1 established by U.S. Survey 1755.

In its factual findings the court elaborated:

> The correct point of beginning for Plat 75-11 . . . is a monument created by U.S. Survey 1755 called "Witness Corner to Meander Corner 1" ("WCMC1"). Plat 75-11 is a "paper plat" that establishes no monuments, but it is an accurate representation of U.S. Survey 1755. Therefore, monuments established by U.S. Survey 1755 are used to locate lots created by Plat 75-11. U.S. Survey 1755 established only one monument, WCMC1. Therefore, WCMC1 is the correct point of beginning for Plat 75-11.

Taken together, the superior court's findings and conclusions reflect a determination that the deeds unambiguously describe the lots based on WCMC1, which in turn can be unambiguously identified by bearing, distance, and description from U.S. Survey 1755. We agree: the deeds are unambiguous. The court therefore did not err when it turned, not to extrinsic evidence of the parties' intent, but to the factual question of which rock was the witness corner identified in U.S. Survey 1755.

> **2.  The superior court did not clearly err by finding that the rock marked "WCMC1 S1755" was the witness corner identified in U.S. Survey 1755.**

The superior court concluded that "[t]he monument used by R&M Engineering [to create Plat 2012-32] is the monument created by U.S. Survey 1755 and

therefore the correct point of beginning for Plat 75-11." Although there was somewhat conflicting evidence at trial, the court's finding is amply supported by the record.

First, Bean testified that when he surveyed Colt Island in the 1970s, he could not locate a rock marked as Dahlquist had described, with the inscription "WCMC1 S1755"; Bean eventually found a rock with a "fine X" that he concluded was WCMC1, in part because it lay along the correct bearing from USLM 1285 as given in U.S. Survey 1755. He extrapolated a location for Meander Corner 1 based on his assumption that the rock with the faint "X" was WCMC1 and used that point to start his survey. But while the bearing from USLM 1285 to Bean's Meander Corner 1 closely matches the bearing recorded in U.S. Survey 1755, the distance between them does not — it is about 22 feet longer than Dahlquist's field notes record. And Bean admitted that while conducting an unrelated survey in 2002, he saw a rock with the letters "WCMC1 S1755" vertically inscribed, located approximately 22 feet from the rock with the faint "X," which he believed he had missed earlier because the inscription had not been chalked.

The developer who hired Bean also testified that during their surveying work in 1974, he found a piece of slate inscribed with a cross and the letters "U.S. 1755 WC." However, he described the letters as being written horizontally, not vertically. The court believed it likely that the developer had "found the right rock but [wa]s misremembering" the direction of the inscription.

Additionally, surveyor Davis testified that during his 2008 survey for the owners of another nearby lot, he found a rock — likely the same one Bean had seen in 2002 — that he took to be WCMC1; it lay some distance from the rock with the faint "X" and had "scribing perfectly and exactly matching [Dahlquist's] field notes." He testified that he colored the inscription with a paint pen to make it more visible. The exhibits include a photo of a rock marked as Davis described, with a cross and the letters

"WCMC1 S1755" vertically inscribed. Davis measured the distance from this rock to USLM 1285, and found it to be 1.12 feet off from the distance calculated according to Dahlquist's field notes, a discrepancy he attributed to the fact that in 1927, Dahlquist could not have physically measured the distance across water but would have had to determine it mathematically, introducing some error. Davis testified that he did not complete his survey because he found a number of temporary markers throughout the subdivision that did not match the corners he had computed based on U.S. Survey 1755, and he was reluctant to "convolute" the existing "confusion as to . . . where property lines were."

Johnson testified that his crew "had no problem finding" the vertically inscribed monument for WCMC1 when they performed their 2012 survey. They recorded a distance of 3,813.49 feet between USLM 1285 and the rock they determined to be WCMC1, which matches the distance Davis measured. Johnson maintained that the R&M crew had computed the correct boundaries based on the monuments identified in U.S. Survey 1755, even though R&M's boundaries were shifted north and east of where Bean had located them. He acknowledged that accepting his crew's boundaries for Lots 14 and 15 would imply different boundaries than Bean's for adjacent lots as well. But he pointed out that Plat 75-11 contained at least one discrepancy aside from the locations of Meander Corner 1 and WCMC1: the sum of the distances along the meander lines on the western shore of the island — where the Halls' and Collinses' lots are situated — differed from the sum of the lot lengths in that area by ten feet, though they should have matched.

The superior court thoroughly evaluated all of this evidence, noting that the distance and bearing from USLM 1285 to the rock Johnson and Davis used corresponded much more closely to those in Dahlquist's notes than the distance and bearing to Bean's rock with the faint "X." The court explicitly considered — and rejected — the

suggestion raised at trial that the rock used for Plat 2012-32 was not Dahlquist's WCMC1, but had instead been inscribed much later. This suggestion was based on two facts: (1) that a number of people had searched unsuccessfully for WCMC1 over the years, and (2) that the engravings on the rock found by Johnson's crew were carved vertically, not horizontally. The court found it unsurprising that people might fail to find the inscription despite searching for it "given the growth of moss and the number of shale rocks on Southeast Alaska beaches," especially before the inscription was marked with chalk or paint. And the court reasoned that while it might seem odd for a surveyor to carve the letters vertically rather than horizontally, "a forger would have no more reason to make them vertical than the original surveyors did." Finally, the court found that the discrepancies between Plat 75-11 and the plats Bean prepared in 2014 and 2015 made his surveying work less credible overall. Based on these findings, the court determined that the rock used for Plat 2012-32 was the WCMC1 in U.S. Survey 1755.

Given the superior court's thorough consideration of the evidence before it and the deference we accord its credibility determinations on review, we conclude that this finding was not clearly erroneous.

### 3. The superior court did not clearly err by finding that the markers Bean placed in the 1970s were insufficient to control future surveys.

The Collinses argue that even if the inscribed rock used for Plat 2012-32 is Dahlquist's WCMC1, Bean established sufficient markers and monuments when he surveyed the subdivision in the 1970s that those boundaries should control. They further argue that even if Bean's mid-1970s markers cannot be recovered, the location of cabins, other structures on the island, and access trails such as Totem Pole Trail provide evidence of the boundaries' location.

The Collinses rely on Michigan Supreme Court Justice Thomas Cooley's concurrence in the 1878 case *Diehl v. Zanger*.[25] That case dealt with a dispute between parties who had treated a fence between their properties as the boundary until a later survey demonstrated that the fence — and other fences and buildings in the subdivision — were incorrectly located.[26] The majority opinion emphasized that the evidence before the trial court established that "the physical evidences of recognized and long admitted bounds . . . were visible and apparent to everybody," and concluded that the trial court should have given weight to these long relied upon physical markers even though the subsequent survey had shown them to be placed in error.[27] In his concurrence, Justice Cooley stated that the original survey should control even if it contained errors and outlined a two-step process for determining an original survey's boundaries.[28] Under Cooley's framework, a subsequent surveyor should:

> direct[] his attention to the ascertainment of the actual location of the original landmarks . . . , and if those [are] discovered they must govern. If they are no longer discoverable, the question is where they were located; and upon that question the best possible evidence is usually to be found in the practical location of the lines, made at a time when the original monuments were presumably in existence and probably well known.[29]

The superior court, however, found that Bean had not set any monuments or recorded any work that would govern future surveys. Bean's own testimony supports

---

[25] 39 Mich. 601, 603-06 (1878) (Cooley, J., concurring).

[26] *Id.* at 602 (majority opinion).

[27] *Id.* at 602-03.

[28] *Id.* at 605 (Cooley, J., concurring).

[29] *Id.*

this finding. He acknowledged that he did not put in any monuments in 1974, "[j]ust reference points and control points." He noted that control points were usually not intended to be references for future surveyors but were merely there to aid him in completing the survey. He specifically distinguished them from monuments, which he said had to be identifiable "with a name or description" and durable enough to "last a certain amount of time."

The court also found that lot boundaries were not apparent from fences or other markers but had in fact been unclear for decades. Crucially, the Halls' predecessor in title to Lot 15, George Fisher, testified that he did not know the exact lot boundaries at the time he purchased it. He was uncertain about the locations of his cabin and outhouse relative to his property lines, though he believed he had complied with setback restrictions. He testified that the corners of the lot were not permanently marked either when he bought the property or when he sold it to the Halls. And he testified that the only boundary marker present when he purchased Lot 15 — a stake marked with the lot number at what he believed was the northeastern corner of the lot — "disappeared somehow" by the time he sold it to the Halls.

Davis testified that he too encountered significant discrepancies during his 2008 survey. He stated that the markers identified by other property owners were not consistent with where his survey would have located the boundaries of Lot 13, the lot he was hired to survey. And he noted that none of the markers he saw had a surveyor's cap or were sufficiently permanent to qualify as a survey monument.

Additionally, the evidence at trial suggested that Totem Pole Trail was not a clear, unambiguous marker of the lot boundaries. Fisher testified that the trail had not yet been cleared when he bought his lot in the mid-1970s; once it was cleared, he assumed the trail boundary "approximately" demarcated one edge of his lot but stated that "it may have been off a little bit." Multiple residents of Colt Island testified that the

edges of the trail did not exactly coincide with where they believed the lot boundaries lay. And the developer who initially hired Bean testified that when he had Totem Pole Trail logged, he specifically cleared the edges of the trail partially into the unsold lot boundaries, meaning that the physical width of the trail did not coincide exactly with the platted boundaries.

It was therefore not clearly erroneous for the superior court to find that neither Bean's markers from the 1970s nor other property owners' use of their property or the island's access trails had established the boundaries the Collinses sought to enforce. Therefore, because the deeds and related plats are unambiguous, because the record supports the court's finding that the rock used by Johnson's crew was WCMC1, and because no other markers sufficed to establish new boundaries, we conclude that the superior court did not err when it determined the boundaries in Plat 2012-32 to be correct.

## B. The Superior Court Did Not Err When It Concluded That No Boundary Had Been Established By Acquiescence.

The Collinses argue that under the doctrine of boundary by acquiescence, recently adopted in *Lee v. Konrad*,[30] the superior court should have found that the boundaries Bean set in 2009 and recorded in Plat 2014-46 were established either by the parties or their predecessors. They argue that "active and continued use of Totem Pole Trail and other obvious monumentation showing subdivision boundary lines for over three decades" establishes the Halls' and their predecessors' acceptance of Bean's boundary lines.

*Lee v. Konrad* set forth a three-element test for boundary by acquiescence: "[A] boundary line is established by acquiescence where adjoining landowners (1) whose

---

[30]     337 P.3d 510, 520 (Alaska 2014).

property is separated by some reasonably marked boundary line (2) mutually recognize and accept that boundary line (3) for seven years or more."[31]  In that case the owner of a subdivision lot set fence posts along the boundary with an adjacent lot, with his neighbors' permission and based on survey markers setting the boundary.[32]  He later completed the fence; in the meantime his original neighbors and their successors in interest "treated the boundary line marked by the fence posts as the true property line without any dispute."[33]  The neighbors subsequently sold their lot "as-is" to a buyer, making no representations that the fence did not reflect the correct boundary.[34]  Shortly afterward, the buyer had her property surveyed and its corners marked; the owner who had built the fence, believing that the surveyor had placed a marker incorrectly, filed for a declaratory judgment to quiet title and affirm the fence as the correct boundary.[35]  We adopted and applied the stated test for boundary by acquiescence and concluded that the neighbors' history of mutual acceptance of the fence posts and fence as the property line had established a boundary by acquiescence.[36]

Here, the superior court concluded that the evidence was not sufficient to establish the boundary recorded in Plats 2014-46 and 2015-27 by acquiescence.[37]  The

---

[31]     *Id.*

[32]     *Id.* at 514, 521.

[33]     *Id.* at 514.

[34]     *Id.* at 514-15.

[35]     *Id.* at 515-16.

[36]     *Id.* at 520-21.

[37]     The superior court applied a clear and convincing evidence standard to the test for boundary by acquiescence, concluding that the Collinses had failed to meet this
(continued...)

court found that, because the Halls had not accepted the boundary set by Bean in 2009 and because fewer than seven years had passed between 2009 and the start of the lawsuit in 2014, they had not acquiesced to Bean's boundaries. The record supports this finding: Hall testified that when Bean placed the boundary markers in 2009, Bean removed stakes that Hall had set in 1999. Hall estimated that his 1999 boundary and Bean's 2009 boundary differed by about ten feet. And it was 2012 when, according to Hall, the Collinses first threatened to sue over the shop and outhouse, prompting the Halls to obtain and record Plat 2012-32.

The superior court also found that no boundary by acquiescence had been established prior to 2009. The record supports this finding as well: testimony by both Fisher and Hall indicated that the boundary was not marked at all when the Halls bought the property. Fisher was unsure of Lot 15's exact boundaries when he bought it, and does not appear to have placed any boundary markers before selling it to the Halls. In fact, the single boundary marker that existed when Fisher owned Lot 15 had been removed by the time of the Halls' purchase: Hall testified that when he went to look at the lot prior to buying it, he saw a single stake labeled "14" on one side and "15" on the other, which he assumed marked the boundary; but the stake was gone by the time he

---

**37**     (...continued)
burden. *Cf. Nome 2000 v. Fagerstrom*, 799 P.2d 304, 309 (Alaska 1990) (requiring clear and convincing evidence to prove adverse possession). We have not had occasion to determine whether a party seeking to establish a boundary by acquiescence must meet this heightened evidentiary burden, and we decline to do so here. Neither party's arguments on appeal addressed the standard of proof, and we are reluctant to rule on an issue without the benefit of adversarial briefing and argument. *See State v. Ranstead*, 421 P.3d 15, 23 n.53 (Alaska 2018) ("Appellate courts typically do not address issues that the parties have not briefed."). In any case, given the extensive evidence at trial of longstanding uncertainty over the correct boundaries, we are doubtful that the Collinses would have been able to satisfy even a preponderance standard.

bought his lot.  Additionally, the Halls' outhouse, which allegedly encroaches onto the Collinses' property, was built by Fisher; as the superior court noted, this either indicates that the original boundary marker did not coincide with Bean's 2009 line or that Fisher did not recognize and accept the 2009 boundary.[38]  And none of the photos in evidence appear to show a fence or other marker in the boundary area sufficient to constitute a "reasonably marked boundary line."[39]

It was thus not error for the superior court to conclude that none of the elements of the *Konrad* test had been met and that no boundary by acquiescence had been established to alter the boundaries recorded in the deeds and associated plats.

## C.    The Superior Court Did Not Clearly Err By Finding That The Restrictive Covenants Had Been Abandoned.

The Collinses argue that the superior court's findings and conclusions "did not meaningfully address the issue of compliance with the covenant requirements" and assert that this issue requires remand.  They contend that adoption of Plat 2012-32 will cause "additional problems regarding land use and covenant application," presumably not only with regard to the Halls' outbuildings but also for other Colt Island property owners.  The Halls respond that the superior court's finding that the covenants at issue had been abandoned was "well-supported by the record."

Contrary to the Collinses' assertion that the court failed to meaningfully address the covenants, the court's findings of fact and conclusions of law explicitly discuss them, albeit briefly.  The court found that trial testimony established "that a number of buildings on Colt Island are less than [20] feet from property lines and that there are a number of other outhouses on the Island . . . [that] have never been the subject

---

[38]    *See Lee*, 337 P.3d at 520.

[39]    *Id.*

-26-                                              7410

of violation complaints." The court therefore determined that "[t]o the extent the[] covenants would prohibit pit privies or require the Halls' outhouse and shop to be farther from Lot 14, they have been abandoned." The court concluded that enforcing the covenants against the Halls, given the other unchallenged and longstanding violations, would be inequitable.

We have held that "covenants will be deemed waived if the 'evidence reveals substantial and general noncompliance.' "[40] Failure to enforce a covenant against a single party or property is not sufficient to establish abandonment, but more widespread lack of enforcement may be.[41] Here, the record establishes that multiple property owners on Colt Island had violated the setback restrictions and sewage disposal requirements. One property owner, for instance, admitted that he had built a woodshed "right along the edge of the property" and had not "thought about the setbacks at the time." Another acknowledged that his cabin might be in violation of the setback requirement. Multiple witnesses with property on the island testified that there were other outhouses. The Halls' outhouse had in fact been built by Fisher years before the Halls bought Lot 15. And, as the Halls point out on appeal, the declaration of protective covenants entrusts enforcement to a homeowners' association — but no homeowners' association was ever formed.

The record thus shows that neither the setback requirements nor the prohibition on outhouses had been enforced against either the Halls or other property owners violating them, prior to this lawsuit. It was not error for the superior court to find

---

[40] *Kalenka v. Taylor*, 896 P.2d 222, 226 (Alaska 1995) (quoting *B.B.P. Corp. v. Carroll*, 760 P.2d 519, 523-24 (Alaska 1988)).

[41] *See id.*

that the covenants had been abandoned and conclude that they were unenforceable against the Halls.

**D.    We Remand For Findings And A Determination On The Collinses' Physical Trespass Claim.**

The Collinses argue that, even if the boundaries in Plat 2012-32 are adopted, uncontroverted evidence at trial showed that the Halls trespassed on the Collinses' property. They contend that they are therefore entitled at least to nominal damages and imply that the trial court erred by failing to make findings on the trespass claim.

A trespass is "an unauthorized intrusion or invasion of another's land."[42] Even a trespasser who does not cause any harm to the land may be liable for nominal damages simply based on the fact of the intrusion.[43] The Collinses raised two distinct trespass claims. The first — that the Halls' shop and outhouse encroach onto their land — is resolved by the adoption of Plat 2012-32's boundaries. But their second trespass claim alleged that David Hall personally trespassed on their property in June 2013. The Collinses assert on appeal that this second claim does not depend on which boundary line controls.

The superior court's findings and conclusions do not address this second trespass claim at all, instead simply stating that the Collinses' "claims are denied in their entirety." But the record contains evidence bearing on this claim: Ray Collins testified at trial that he had twice found David Hall "underneath the building" on the Collinses' property, "taking some building materials." Photo exhibits purport to show Hall on the Collinses' land between the two families' cabins. And Hall admitted that he had walked

---

[42]    *Lee v. Konrad*, 337 P.3d 510 at 522 (quoting *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 539 (Alaska 2001)).

[43]    *Id.* at 522 n.36.

onto the Collinses' property without their permission in June 2013, apparently to return items that the Collinses or their former co-owner had placed on the Halls' land. In closing argument, the Collinses' counsel specifically distinguished the two trespass claims and noted that the second did not depend on the boundary location:

> [T]here [are] multiple claims of trespass. And I think there's proof of an obvious trespass on the part of Mr. Hall. The evidence, both by Mr. Collins and Mr. Hall, basically admits that wherever you draw the line — whether it's the Bean line [i.e., Plat 2014-46], Mr. Hall's self-survey line, or the R&M line [i.e., Plat 2012-32] — he was on property belonging to Ray and Carol Collins.

The Collinses sought nominal damages for this claim, proposing $5 as an appropriate award.

Without the relevant findings or conclusions, we have no basis on which to review the superior court's denial of this claim.[44] We therefore remand specifically for consideration of the Collinses' claim that David Hall physically trespassed onto their property in June 2013. We express no opinion as to the merits of this claim.

## V. CONCLUSION

Because the superior court's decision is supported by the record on the issues of the location of the boundary line, boundary by acquiescence, and enforcement of the covenants, we AFFIRM the court's decision on these issues. Because the superior court's decision contained no findings or conclusions as to the Collinses' second trespass claim, its denial of this claim is REVERSED and REMANDED.

---

[44]     *See State v. Schmidt*, 323 P.3d 647, 668 n.107 (Alaska 2014) ("[A] superior court's order must contain specific findings of fact and conclusions of law to permit meaningful review by this court." (alteration in original) (quoting *Simpson v. Murkowski*, 129 P.3d 435, 448 n.65 (Alaska 2006))).